BODIMETRIC HEALTH SERVICES, INC., et al., Plaintiffs,

v.

AETNA LIFE & CASUALTY, et al, Defendants.

United States of America, Intervenor.

No. 87 C 3465.

United States District Court, N.D. Illinois, E.D.

Feb. 9, 1989.

---

Leonard C. Homer, Carel T. Hedlund, David B. Hamilton, Ober Kaler Grimes & Shriver, Baltimore Md., George J. Koelzer, Ober Kaler Grimes & Shriver, New York City, Theodore R. Tetzlaff, Michael Rigney, Jenner & Block, Chicago, Ill., for plaintiffs.

Jack R. Bierig, David F. Graham, Robert M. Portman, Sidley & Austin, Chicago, Ill., John Ahearn, Aetna Life Ins. Co., Hartford Conn., for defendants.

James P. White, Asst. U.S. Atty., Donna Morros Weinstein, Chief Counsel, Region V, Richard A. Urbin, Asst. Regional Counsel, Chicago, Ill., for proposed intervenor.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff American Service Bureau ("ASB"), and two of its subsidiaries, Bodimetric Health Services, Inc. ("BHS") and Bodimetric Home Health Care, Inc. ("BHC"), bring this action against defendants Aetna Life & Casualty and Aetna Life Insurance Company (collectively referred to as "Aetna"), alleging fraud and wrongful misconduct in the processing of their claims to reimbursement under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. ("Medicare Act" or "Act"). Plaintiffs, Illinois corporations, previously provided home health care and related services to Medicare patients across the nation.

In 1984 plaintiff BHS nominated Aetna to act as its fiscal intermediary pursuant to 42 U.S.C. § 1395h. Plaintiffs allege that Aetna, in its zeal to impress the government with its effectiveness in reducing health-care costs, arbitrarily and unlawfully denied plaintiffs reimbursement to which they were entitled, engaging in a pattern of fraudulent practices designed to ruin plaintiffs' business. Plaintiffs recite claims under various state tort theories and the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) ("RICO"). The United States seeks intervention and, together with Aetna, moves to dismiss, raising jurisdictional and immunity defenses. We deny the motion for intervention as moot and grant the motion to dismiss.

## BACKGROUND

The Medicare program provides health insurance for the aged and disabled under the Social Security Amendments of 1964, Pub.L. No. 89–97, Title 1, 79 Stat. 286 (1965). The Department of Health and Human Services ("HHS") administers the program through the Health Care Financing Administration ("HCFA"). Reimbursement under the program is divided into two parts: Part A of the Medicare program covers the costs incurred by eligible beneficiaries for certain hospital and home health services (§§ 1395c–1395i–2); Part B provides elective supplemental coverage for certain expenses, including physicians' fees and laboratory tests (§§ 1395j–1395w).

HHS reimburses home health care providers the cost of services, including part-time or intermittent care provided by nurses and/or home health aides; physical, occupation or speech therapy; and medical social services rendered under the direction of a physician. Section 1395y(a)(1)(A) precludes reimbursement for services "which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." To that end, in order to be reimbursed for home health

services, § 1395f(a)(2)(C) requires certification by a physician that the services were needed, that the individual was confined to the home (with some exceptions), and that there was a developed plan—with periodic review—for the administration of such services under the supervision of a physician ("plan of treatment"). Home health care providers are entitled to reimbursement of the lesser of their customary charges or reasonable costs, including operational costs of related organizations (§ 1395f(b)).

Under the terms of the Act private organizations play a "considerable role" in the administration of both the hospital insurance and supplementary plans. *See* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 1992. Section 1395h permits health care providers to nominate a public or private agency to act as a fiscal intermediary for the purposes of facilitating payments under Part A of the program.[1] The Secretary of HHS is authorized to contract with such an agency to provide "for the determination ... of the amount of the payments required ... to be made to [eligible health care] providers" (§ 1395h(a)). Those contracts require the fiscal intermediary to review claims for compliance with coverage requirements, determine the reasonable cost of services, make payments directly to health care providers, provide consultative services, communicate to providers any information or instruction from HCFA, audit provider records and assist with utilization review activities. *Id.*, 42 C.F.R. § 421.100; Intermediary Agreement, Amended Complaint, Exhibit 1, Article II. The intermediary reviews, processes and pays claims of a provider throughout the year on a per-visit basis. At the end of the fiscal year the provider submits a cost report which is audited by the fiscal intermediary, who then issues a determination as to the final amount of reimbursement due to the provider by Medicare, and it reconciles claim payments made during the year to determine any overpayment or underpayment (42 U.S.C. § 1395g).

If a claim for reimbursement under the Act is denied, health care providers may request a reconsideration by the intermediary, 42 C.F.R. §§ 405.710(b), 405.711. If the claim exceeds $100, the provider has the right to be heard before an administrative law judge ("ALJ"), 42 C.F.R. § 405.720, and may also request review by the Appeals Council, 42 C.F.R. § 405.724. If the amount in controversy exceeds $1,000, the provider may appeal to the United States District Courts, 42 C.F.R. § 405.730. Congress intended the remedies provided by these review procedures to be exclusive. *See* S.Rep. No. 404, *supra* at 1995.

Congress drafted the provisions of the Act with the intention that private health care organizations would employ their administrative expertise to aid HCFA in managing the program. *See* S.Rep. No. 404, *supra* at 1976 (describing a role for private agencies in framing regulations under the Act's provisions), 1990 (noting that state agencies and private organizations would have a "major administrative role"). In anticipation of the complications which might arise from the involvement of private entities in the administration of such a large public program, Congress provided the Secretary with authority to indemnify intermediaries against certain liabilities:

> In the performance of their contractual undertakings, the carriers and fiscal intermediaries would act on behalf of the Secretary, carrying on for him the governmental administrative responsibilities imposed by the bill. The Secretary, however, would be the real party in interest in the administration of the program, and the Government would be expected to safeguard the interests of his contractual representatives with respect to their actions in the fulfillment of commitments under the contracts and agreements entered into by them with the Secretary.

*Id.* The original HHS regulations borrowed language directly from the Senate Committee's report. *See* 20 C.F.R.

---

1. Private organizations providing reimbursement under Part B are called carriers. *See* 45

Fed.Reg. 42174 (June 23, 1980).

§ 405.670 (1970); *Kuenstler v. Occidental Life Insurance Co.*, 292 F.Supp. 532, 535 (C.D.Calif.1968). In 1980, HHS reorganized and renumbered these regulations. 45 Fed.Reg. 42178 (June 23, 1980). The text of the revised version was slightly altered:

> *Indemnification of intermediaries and carriers.* Intermediaries and carriers act on behalf of HCFA in carrying out certain administrative responsibilities that the law imposes. Accordingly, their agreements and contracts contain clauses providing for indemnification with respect to actions taken on behalf of HCFA and HCFA is the real party of interest in any litigation involving the administration of the program.

42 C.F.R. § 421.5(b).

Guided by these principles, Aetna and HHS entered into an agreement which provides:

> In the event the Intermediary or any of its directors, officers, employees, or other persons who are engaged or retained by the Intermediary to participate directly in the claims administration process, are made parties to any judicial or administrative proceeding arising, in whole or in part, out of any functions of the Intermediary under this agreement in connection with any claims for benefits by any ... provider of services, the Secretary shall, to the extent permitted by law, hold the Intermediary harmless for all judgments, settlements ... awards, and costs, in favor of such ... provider of services, incurred by the Intermediary or any of its directors, officers, or employees or other persons who are engaged or retained by the Intermediary to participate directly in the claims administration process, in connection therewith.

However, the agreement further provides that the Aetna shall reimburse HHS for

> any valid judgment or award paid by the United States in the discharge of the Secretary's obligations under this Article if the liability underlying the judgment or award was the direct consequence of conduct on the part of the Intermediary determined by judicial proceedings or the agency making the award to be criminal in nature, fraudulent, or grossly negligent; provided, however, the Intermediary shall not be required to reimburse the Secretary that portion of an award or judgment directly attributable to an allowable program benefit under Title XVIII of the Act.

### Plaintiffs' allegations

Plaintiff BHS was the owner of a chain of home health agencies qualified to provide services under the Medicare program. BHS agencies began servicing Medicare patients in 1980 and were then reimbursed by the Office of Direct Reimbursement ("ODR"), a component of HCFA. Plaintiffs allege they were rarely denied reimbursement for their claims by ODR (am. cplt. ¶ 20). In 1984, BHS nominated Aetna as its intermediary and continued to receive reimbursement for virtually all of the claims that it submitted. Those claims included costs incurred by ASB as a related organization under the Secretary's regulations, 42 C.F.R. § 413.17.

Plaintiffs allege that "in or about January, 1985, HHS performed a contractor evaluation ... which was critical of Aetna's performance as a fiscal intermediary. At that time, an inordinate number of claims purposely had not been reviewed by Aetna" (am. cplt. ¶ 23). Subsequent to this critical review, "Aetna, secretly, arbitrarily and without informing [plaintiffs] began policy changes in its review process and formulated rules for review that were withheld from BHS" (am. cplt. ¶ 24).

Plaintiffs assert a number of ways in which Aetna acted beyond the scope of its contractual authority and fraudulently denied claims for its own ends. First, Aetna allegedly required claims to contain certain "buzzwords," without which the claims were considered improper, although Aetna never informed BHS of this requirement. Employing this technique, Aetna denied thousands of claims—as many as 75 per day—without regard to their underlying substance. Second, the amended complaint contains allegations that Aetna arbitrarily denied claims as medically unnecessary,

knowing that BHS would nevertheless receive some of those funds via the "waiver of liability" provisions of 42 U.S.C. § 1395pp and 42 C.F.R. § 405.330 and therefore would probably not appeal those denials. Then Aetna employed a method plaintiffs call "linked denials." Under the Medicare Act unskilled home health care, such as services from a home health aide, is covered only where the individual receives skilled home health care as well. Plaintiffs allege that Aetna denied all claims based upon the services of home health aides in those instances where Aetna wrongfully and unlawfully determined the skilled services to be medically unnecessary. Third, Aetna allegedly denied claims for the reason that accompanying documentation was not submitted, in some instances claiming that plaintiffs neglected to pay sufficient postage. Plaintiffs, however, allege that BHS officials personally supervised the mailing of the supporting documents, some of them three to six times. Finally, plaintiffs complain that they submitted claims that were in compliance with the requirement that services be rendered in accordance with a plan of treatment but Aetna denied them anyway. They allege that Aetna employed the concept of "treatment week" (counting from the day of the beneficiary's first visit) rather than "calendar week" in determining compliance with the plan of treatment, although ODR, plaintiffs claim, had always employed the calendar week. However, since Aetna secretly used the treatment week, it determined that numerous claims were not rendered in accordance with physicians' orders and denied claims arising therefrom. Plaintiffs allege that Aetna agreed to reimburse plaintiffs for denials under this rubric occurring prior to May 1, 1985, although they have not yet fulfilled this promise.

Plaintiffs describe a pattern or practice which was designed to lull them into believing that the onslaught of denials was the fault of plaintiffs, so BHS would not terminate its relationship with Aetna. After a flurry of denials in January 1985, BHS requested a meeting with Aetna, which was held on February 27. Plaintiffs allege that Aetna falsely represented that the denials were extraordinary events caused by efforts to catch up on a backlog of claims. Aetna did not inform BHS that it needed to change either its form of documentation or its provision of home health services. After further denials BHS again met with Aetna in May, when the intermediary falsely represented that the denials were due to reductions in Aetna's staff from federal funding cutbacks, but that at that time Aetna was caught up in its review. Plaintiffs also recount a series of letters and telephone calls where Aetna officials represented that they were following regular procedure and were not to blame for the denials.

As evidence showing Aetna's bad faith in the processing of their claims, plaintiffs allege that they have received an 88% reversal rate for the "medically unnecessary" denials which they appealed. In cases where BHS has entered an appearance and argued for reversal, the ALJs have reversed approximately 99% of the denials. Plaintiffs further claim that Aetna did not consider these reversals when calculating the amount of protection BHS could receive under the waiver of liability provisions, causing even further damage. Plaintiffs also claim that Aetna was directed to deny $5 in claims for every dollar allowed,[2] but carried forth this mission with such vigor that they achieved a 22.1–to–one ratio, far higher than any other Medicare fiscal intermediary.

Plaintiffs allege that, due to Aetna's misconduct, they have been forced to close their home health agencies and have suffered damages in excess of $8,000,000. Plaintiffs claim that Aetna has engaged in this fraudulent and deceiving practice against a number of providers, and the amended complaint contains specific allega-

---

**2.** It is not clear who directed Aetna to create a five-to-one denial ratio. In their amended complaint plaintiffs accuse Aetna's Connecticut supervisors of this policy, although they also allege, in their memorandum opposing the government's intervention, that this policy came from HHS.

tions of the financial ruin of various other home health care agencies, including St. Vincent's Memorial Hospital Home Health Care, Harrisburg Medical Center Home Health Agency, Alexian Brothers Home Health Care, and Beverly Home Health Care.

## DISCUSSION

Aetna moves to dismiss the amended complaint, arguing that plaintiffs' claims are precluded by the statutory scheme of the Medicare Act, that Aetna is entitled to both official and sovereign immunity, that such immunity is absolute, and that plaintiffs' state law tort and federal RICO claims are preempted by the Medicare Act. Plaintiffs recognize, correctly, we believe, that those various doctrines are intertwined because all of them rest, ultimately, on a determination of the extent to which a provider can seek relief against a fiscal intermediary for the perceived wrongs of that agency, when that agency is performing an administrative function for the government. That determination is complicated here both because the legal concepts are complex, do not lend themselves to bright line standards, and often lead to somewhat conflicting judicial decisions and because a fiscal intermediary is a somewhat unique legal animal.

We have stated plaintiffs' allegations at some length because a characterization of those allegations is central to plaintiffs' ability to proceed here. Oversimplified, plaintiffs' contentions are that their suit is against private parties for RICO violations and common law tortious conduct beyond the scope of their authority and contrary to their contractual obligations to the government. Plaintiffs contend that they are attacking the defendants' methodology. Those violations and torts do not arise under the Medicare Act and have caused plaintiffs injury, independent of whatever reimbursement claims they may have for services provided. Defendants contend that the suit is, essentially, an action against an instrument of government, bottomed on claims that the providers were not properly paid for the services they provided—claims which can only be reviewed

through and to the extent provided by a statutory administrative process.

Can plaintiffs' allegations be teased into the legal model they present to escape dismissal? We think not.

■ First, we deal with certain matters which because of the views expressed here are not outcome-determinative. The Secretary seeks to intervene either as a matter of right or by permissive intervention. That petition fully sets forth the Secretary's position, the complaint seeks no relief against the government, and we are dismissing the complaint. In those circumstances we see no purpose to be served by considering that petition and we deny it as moot. Both plaintiffs and defendants try to use the indemnity provisions to bolster their positions, defendants by suggesting that the government and public monies are therefore more directly involved and plaintiffs by arguing that the indemnities indicate that the Secretary thought that fiscal intermediaries could be liable to providers and that therefore that must be so. Government cannot, however, extend a protective cloak by choosing to indemnify, *Group Health Inc. v. Blue Cross Ass'n,* 625 F.Supp. 69, 76 (S.D.N.Y.1985), *appeal dismissed,* 793 F.2d 491 (2d Cir.1986) (jurisdiction lacking), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 758 (1987); *Kolpak v. Bell,* 619 F.Supp. 359, 372 (N.D.Ill. 1985), and an indemnification obligation is far too weak a reed upon which to rest the creation of substantive obligations and remedies. No one disputes that defendants could be liable at least for constitutional torts. And in a complex and uncertain legal area simple prudence dictates that the ultimate burden of judgments be assigned in the event that some court should determine that there could be such judgments.

■ Further, we question whether sovereign immunity is directly implicated here. The government is not a defendant. Plaintiffs do not seek recovery from the public fisc nor request an injunction to compel or restrain Aetna in its official capacity. Sovereign immunity does not come into play since in "a suit against the officer to recov-

er damages for the agent's personal actions ... the judgment sought will not require action by the sovereign or disturb the sovereign's property." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687–88, 69 S.Ct. 1457, 1460–61, 93 L.Ed. 1628 (1949). Finally, the concepts of official immunity may be implicated, but we do not rest upon that concept. The policy considerations inherent in that concept, however, and inherent in sovereign immunity doctrine for that matter, also, are germane to the determining issue in this case, and that is preemption in various guises.

■ In broad terms, official immunity protects those who, as the government representatives, carry out the government's directives. The Federal Torts Claims Act adopts that model, although it does so through a limited waiver of sovereign immunity: a party suffering an injury at the hands of a government employee can sue the government within the parameters of the statute but cannot sue the employee. The official immunity doctrine arises from judicial decision rather than by statute but speaks to the same end, protecting the government's representative from having to justify his discretionary decisions in court so as not to inhibit the exercise of his judgment. That means, of course, that the wicked can go unpunished and the injured may be left without a remedy. If the representative is acting within the outer reaches of his scope of authority he is immune, even if the motives and purposes of his actions are improper and ignoble. In the absence of judicially-related immunity, however, he is still answerable for constitutional torts, but such are not alleged here.

■ The burden of defendants' contentions is that plaintiffs are, essentially, challenging benefits determinations; that the sole means of mounting that challenge is through the administrative mechanism, that 42 U.S.C. § 1395ff and 42 U.S.C. § 405(h), as well as the general doctrine of exhaustion of administrative remedies, expressly establish this administrative procedure as the exclusive mechanism for review of all benefit claims and of all actions "inextricably intertwined" with such claims, *Heckler v. Ringer*, 466 U.S. 602, 614–617, 104 S.Ct. 2013, 2021–23, 80 L.Ed.2d 622 (1984). They further contend that while the present form of § 405(h) does not expressly refer to diversity actions or to RICO, the present form is a recodification of a prior enactment which did negate diversity actions, the recodification was enacted with the express representation that it resulted in no substantive changes, RICO was enacted subsequent to present § 405(h), and recognizing that later specific jurisdictional grant as a basis for this action would conflict with the congressionally-crafted administrative scheme. In short, defendants urge that Congress adopted a system for challenging benefit determinations and providers cannot, by creative lawyering, avoid the strictures of that system. We agree.

Plaintiffs concede that the administrative benefits determination procedure is exclusive, but they contend that they do not challenge determinations or seek to recover claims here. They characterize their complaint as one against defendants for their own private wrongdoing: the failure to provide advice, to inform them of procedures and interpretations and to safeguard and act upon submissions; the improper use of hypertechnical formulations of the claims ("buzzwords"); the arbitrary changes in the time standard; and the fraudulent motives that pervaded the whole process. They insist that they can prove a pattern or practice without proving their entitlement to specific determinations through computer models, sampling or the like. They point out that they cannot appeal administratively many claims, particularly unskilled claims, when the linked skilled claims have been paid under the Secretary's waiver system.

Although plaintiffs thus characterize their complaint, we conclude that their claims are, at bottom, for a review of the intermediary's benefits determinations. First, plaintiffs' damages flow directly from benefit denials and defendants are entitled to dispute plaintiffs' conclusions claim-by-claim. Congress intended to pre-

clude federal review of such individual determinations. Second, the underlying allegations concerning Aetna's actions provide a basis for plaintiffs' administrative challenges under § 1395ff. True, the Secretary cannot adjudicate plaintiffs' claims under RICO and the common law; yet RICO and the common law would simply provide plaintiffs with theories to recover the value of lost benefits and consequential damages in a case where the underlying facts could be raised in the administrative process. This case is therefore unlike *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 678, 106 S.Ct. 2133, 2140, 90 L.Ed.2d 623 (1986), where the plaintiffs were foreclosed from challenging the Secretary's regulations administratively.

Third, and most important, to prove their claims plaintiffs must rely in a dispositive manner on the standards of the Medicare Act and Aetna's contract with the Secretary. The underlying claim of fraud would necessitate a showing that defendants violated a duty owed to them, and the contours of that duty are found in the Act and the regulations. Plaintiffs must also rely on the denial of an entitlement under the Act to establish the injury required by standing doctrine. Since "both the standing and the substantive basis for the presentation" of plaintiffs' claims are, in considerable part, the Medicare Act, § 405(h) precludes jurisdiction. *See Weinberger v. Salfi*, 422 U.S. 749, 760–61, 95 S.Ct. 2457, 2464–65, 45 L.Ed.2d 522 (1975).

Plaintiffs argue that they are attacking "methodology" rather than benefit determinations. This very claim was rejected by the Supreme Court in *Ringer*, 466 U.S. at 614, 104 S.Ct. at 2021, where the plaintiffs claimed that the Secretary employed an unlawful presumption that certain surgical operations could not be reimbursed under the Act. In the cases that followed *Michigan Academy*, courts have made clear that while jurisdiction is proper to adjudicate challenges to the Secretary's regulations, it is lacking when the claim is merely that the intermediary or carrier misapplied or misinterpreted valid rules or regulations. *See, e.g., Kuritzky v. Blue Shield of Western New York*, 850 F.2d 126 (2d Cir.1988), *cert.*

*denied*, —— U.S. ——, 109 S.Ct. 787, 102 L.Ed.2d 778 (1989); *McCuin v. Secretary of HHS*, 817 F.2d 161, 164–66 (1st Cir. 1987); *Linoz v. Heckler*, 800 F.2d 871, 876 (9th Cir.1986); *Neiman v. Secretary of HHS*, Medicare & Medicaid Guide (CCH) ¶ 37,569 (E.D.N.Y. Sept. 21, 1988) [1988 WL 127456]; *Griffith v. Bowen*, 678 F.Supp. 942 (D.Mass.1988). As stated in *Kuritzky*, "method" does not mean carrier practice, but the method set forth in the Secretary's regulatory scheme. 850 F.2d at 128.

Aetna acted in its capacity as fiscal intermediary when it reviewed plaintiffs' claims, even if it reviewed them improperly for base and fraudulent reasons. Plaintiffs' charges here are therefore inextricably intertwined with benefit determination and must first be processed through the system Congress and the Secretary chose. Although that system may not provide review for all determinations, and may not provide plaintiffs' compensation for consequential damages, this court cannot now make its own determination that thousands of services were reasonable and necessary and that therefore thousands of benefits should have been paid.

## CONCLUSION

We conclude that plaintiffs' claims are inextricably intertwined with Medicare benefit determinations—claims which Congress intended to confine to the administrative process. We therefore grant defendants' motion, and this cause is dismissed. The government's motion to intervene is denied as moot.