Neil J. FARKAS, D.O. and Neil J. Farkas, D.O., P.C., Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF MICHIGAN and Secretary of Health and Human Services, Defendants.

No. 92–CV–70556–DT.

United States District Court, E.D. Michigan, S.D.

Sept. 30, 1992.

, Gordon S. Gold, Southfield, Mich., for plaintiffs.

Debra A. Spicer and Edward W. Fisher, Detroit, Mich., for defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DISMISSING PLAINTIFFS' COMPLAINT, AND ORDER VACATING TEMPORARY RESTRAINING ORDER

ROSEN, District Judge.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Neil J. Farkas, D.O. and Neil J. Farkas, D.O., P.C. ("Dr. Farkas" or "Plaintiff") commenced this action in Wayne County Circuit Court on December 21, 1991. In his two-count Complaint, Dr. Farkas alleged that as a result of billing and directory listing errors regarding his medical practice, Blue Cross and Blue Shield of Michigan ("BCBSM") is liable to him for tortious interference with business relationship and business expectancy (Count I) and intentional infliction of emotional distress (Count II).

Approximately two weeks after filing his Complaint, Dr. Farkas received a letter dated January 7, 1992 from BCBSM in which BCBSM advised him that, from then on, all Medicare claims submitted by him would be

subject to manual review by BCBSM's Medicare Prepayment Utilization Review Department ("PPUR"). To prevent BCBSM from subjecting him to Medicare PPUR review, Farkas filed a motion for temporary restraining order/preliminary injunction in Wayne County Circuit Court. It was in that motion that Plaintiff first raised the PPUR issue (i.e., no mention of PPUR review or its legality or illegality was made in Plaintiff's Complaint).

Based upon Plaintiff's post-Complaint Medicare administration/PPUR review allegations, the Secretary of Health and Human Services (the "Secretary" or the "Government") intervened and removed this action to this Court.[1] Plaintiff subsequently moved to remand the action to state court.

On March 12, 1992, this Court conducted a hearing on Plaintiff's motion for preliminary injunction and his motion for remand. After hearing the oral arguments of counsel for the parties, the Court determined that Farkas's post-Complaint PPUR claim was a "separate and independent claim" under 28 U.S.C. § 1441(c). Therefore, the Court ordered Plaintiff's post-Complaint PPUR claims severed from his tortious interference/intentional infliction of emotional distress Complaint claims, and remanded those state-law tort claims to state court.

With respect to Plaintiff's remaining federal PPUR claim, the Government argued at the hearing that Dr. Farkas is not entitled to judicial review of the decision to put him on Medicare Prepayment Utilization Review. Therefore, the Government argued for dismissal of the federal court action.

In light of the Government's hearing arguments, the Court ordered the parties to submit briefs on the issue of whether Dr. Farkas is entitled to judicial review of the Secretary's determination to place him on PPUR.

The Government and BCBSM timely complied with the Court's additional briefing directive by filing separate Fed.R.Civ. Pro. 12(b) Motions and supporting Briefs, seeking dismissal of Plaintiff's PPUR-placement claim. The Defendants both argue in their Motions that, under the applicable federal statutes, Plaintiff's exclusive avenue for redress of his complaint—if any avenue is available to him at all—is the administrative review mechanism provided in the statute. They further argue that complete and full exhaustion of administrative remedies is a prerequisite to any court challenge relating to the provision of Medicare benefits. Thus, according to the Defendants, because Dr. Farkas has not exhausted his administrative remedies, the court lacks subject matter jurisdiction over this matter and, therefore, this action should be dismissed.

Plaintiff filed two separate Briefs responding to the Government's and BCBSM's respective Motions on April 9 and April 24, 1992, to which Responses the Government replied in a Reply Brief filed April 28, 1992.

Although the Court initially indicated to the parties that no hearing would be held on the Motions to Dismiss, Plaintiff requested in a letter dated May 28, 1992 that the Court hear oral argument. Acting in response to Plaintiff's request, the Court reconsidered its initial "no hearing" determination, and decided that oral argument would be helpful. Accordingly, a hearing on Defendants' Motions was held on September 10, 1992.

Having reviewed and considered the parties' respective briefs on the Motions for dismissal, and having heard the oral arguments of the parties' attorneys at the September 12, 1992 hearing, the Court is now prepared to rule on Defendants' Motions, and this Opinion and Order sets forth that ruling.

## II. DISCUSSION

### A. PREPAYMENT UTILIZATION REVIEW ("PPUR")

#### 1. *Introduction*

According to the January 7, 1992 letter Dr. Farkas received from BCBSM, a review

---

1. BCBSM also separately filed a Notice of Removal of this matter. Because all parties were in agreement that BCBSM and the Government had actually separately removed the same single state court action, the Court dismissed the federal case that resulted from the second removal as redundant, keeping only the lower-numbered case active.

of his medical records had revealed "[n]umerous problems ... in laboratory procedures and other diagnostic studies, as well as office visits." Therefore, BCBSM advised Dr. Farkas that Medicare billings submitted by him after January 7, 1992 would be subject to BCBSM's Medicare prepayment utilization review ("PPUR"). Being placed on BCBSM's PPUR requires that all Medicare billings submitted by Dr. Farkas would have to be accompanied by documentation relating to the patient's condition and treatment rendered. The billings along with the documentation would then be reviewed by the PPUR Department, and following that review a determination would be made regarding payment.

### 2. Medicare's Statutory/Regulatory Scheme

Unlike Medicare's "Part A" hospitalization coverage, Medicare does not provide universal-comprehensive coverage for physician's services.[2] Rather, Medicare's supplemental medical insurance "Part B" physician's services coverage afforded resembles coverage provided by a private medical insurance program. Just as in the case of private medical insurance, certain services and items are specifically excluded from coverage. See 42 U.S.C. §§ 1395k, 1395l, 1395x, 1395y(a). Similarly, like private insurers, Medicare specifies a number of limits on payment for medical items and services. See e.g., 42 U.S.C. §§ 1395u(b)(3)(B) and 1395w-4. See also, 42 C.F.R. § 405.-501 et seq; 42 C.F.R. § 415.

Since Medicare Part B does not cover all health-related services or items provided to an eligible Medicare beneficiary, the mere provision of a service or item to a Medicare beneficiary is insufficient in and of itself to trigger reimbursement, or to trigger reimbursement at the price charged. The Medicare Act and its implementing regulations specify and define those services and items for which Part B reimbursement can be made, as well as the conditions and limitations on payment of covered items and services. See e.g., 42 U.S.C. §§ 1395k, 1395l, 1395x(s), 1395y; 42 C.F.R. §§ 405.-411 et seq.; 405.501 et seq.; 410.1 et seq.

In administering Part B, the Secretary of HHS is authorized to contract with entities referred to as "carriers" to handle the administration of Medicare claims. 42 U.S.C. § 1395u. BCBSM is an authorized Medicare carrier.

By statute, the Secretary is expressly authorized to utilize Medicare carriers to perform certain delineated functions, including audits of Medicare provider records to insure that proper Medicare payments are made and to apply safeguards against unnecessary utilization of services furnished by providers to Medicare beneficiaries. 42 U.S.C. § 1395u(a); 42 C.F.R. § 405.501 et seq.[3]

The Part B carrier, acting as the Secretary's agent, further must determine whether a particular claim meets the applicable Part B criteria, 42 C.F.R. §§ 405.803, 421.200, including whether the service rendered by the physician or item provided is necessary for the diagnosis or treatment of an illness (see 42 U.S.C. § 1395y(a)(1); 42 C.F.R. § 405.310(k)), whether the service or item is otherwise covered or excluded from Part B coverage (see 42 U.S.C. §§ 1395k, 1395x(s); 42 C.F.R. § 410.1 et seq.), and the amount that may be reimbursed for the service or item (see 42 U.S.C. §§ 1395u(b)(3), 1395w-4; 42 C.F.R. §§ 405.-501 et seq.; 415.1 et seq.).

The Act requires that the carrier establish and maintain procedures whereby an

---

**2.** Medicare's hospital insurance program coverage includes services rendered by hospitals, skilled nursing facilities, and home health agencies. Medicare hospital insurance program benefits are known as "Part A" benefits, while physician's and medical treatment services benefits are known as "Part B" supplementary medical insurance benefits.

**3.** Under the Medicare program, beneficiaries may assign their right to payment from the program to the physician or other person furnishing the medical services. 42 U.S.C. § 1395u(b)(3)(B)(ii). When there is an assignment, Medicare pays the physician or other person directly. In return for this, the assignee-physician/provider accepts the Medicare reasonable charge as the full charge for the service and may charge the beneficiary only for any deductible and/or co-insurance. Id.

individual may obtain a fair hearing by the carrier in any case were the amount in controversy is $100 or more and a request for payment has been denied, or not acted upon with reasonable promptness, or where the amount of payment is disputed. *See* 42 U.S.C. § 1395u(b)(3)(C).[4] The carrier is also required by regulation to provide an informal review prior to a hearing. 42 C.F.R. § 405.807. A carrier or hearing officer may also reopen a previous determination regarding payment, and revise that determination. 42 C.F.R. §§ 405.841, 405.-842.

For items or services rendered prior to January 1, 1987, the Medicare Act afforded no further review of Part B matters after the carrier's fair hearing process. However, as part of the Omnibus Budget Reconciliation Act of 1986 (the "OBRA Amendments"), Congress amended the Medicare Act to afford post-carrier fair hearing review by an administrative law judge regarding Part B disputes where the amount in controversy exceeds $500, and judicial review after exhaustion of administrative remedies if the amount in controversy is at least $1,000. *See* 42 U.S.C. § 1395ff; 42 C.F.R. §§ 405.807, 405.820.

By statute, the foregoing administrative review mechanism is an exclusive remedy. 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides:

> The findings and decision of the Secretary after a hearing shall be binding upon all individuals who are parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

### 3. *BCBSM's Medical Claims Review Procedures*

Medicare carriers, such as BCBSM, conduct two types of medical review activities: (1) postpayment audits and (2) prepayment utilization reviews. *See* BCBSM's Brief, p. 1. As their titles suggest, the principal difference between prepayment and postpayment review is timing.

On a *postpayment* review, claims are paid on an "honor system", based upon the information contained on the claim form itself. Physicians, however, must maintain—and produce upon request—supporting medical documentation to verify that each service billed to Medicare was appropriate, medically necessary and not excessive.[5]

Providers subject to *prepayment* ("PPUR") review must submit supporting medical documentation along with each claim presented for payment, and BCBSM reviews those materials and determines payability *before* payment is issued. As the Medicare Carrier's Manual states:

> The primary goal of prepayment utilization screening is to ensure that Medicare pays only for medically necessary services.... Prepayment controls provide [the carrier] with the opportunity to look at services subject to abuse, take corrective action where needed, and improve payment controls for services provided by problem providers before a claim is processed.

---

**4.** This procedure is referred to as the "fair hearing process".

**5.** BCBSM asserts that it was Dr. Farkas's unwillingness to provide records requested so that the carrier could conduct a postpayment audit which resulted in his being placed on PPUR. BCBSM claims that its Medicare auditors have been attempting to audit Dr. Farkas because of apparent "excessive utilization" since the summer of 1990 but that he has been "totally uncooperative, refuses to provide records and has been verbally abusive to auditing personnel." See p. 4 of BCBSM's Brief. According to Defendants, BCBSM requested that Dr. Farkas produce for postpayment review 67 of his patient files. Dr. Farkas, however, was willing only to provide 5 of the 67 patient files requested. Dr. Farkas was warned of the consequences of not cooperating with BCBSM's auditors—his attorney was informed over the phone and in a letter that unless Dr. Farkas cooperated with the audit, he would be placed on PPUR.

[See BCBSM's Brief, p. 2.][6]

## B. THE "METHOD VS. AMOUNT" DICHOTOMY

As indicated above, the Medicare Act was amended in 1986 by the OBRA Amendments. Prior to October 27, 1986, only decisions relating to Part A claims were subject to review. The pertinent provisions of Title 42 prior to October 27, 1986 read as follows:

> (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—
>
>     \*    \*    \*    \*    \*    \*
>
> (C) the amount of benefits under *part A* ... of this subchapter (including a determination where such amount is determined to be zero)...
>
> shall be entitled to a hearing thereon by the Secretary ... and to judicial review of the Secretary's final decision after such hearing is provided....

42 U.S.C. § 1395ff(b) (1982) (emphasis added).[7]

As set forth in Section A(2) of this Opinion and Order, however, prior to the 1986 OBRA Amendments, *no review*—judicial, administrative, or otherwise—was provided in the Act for decisions regarding *Part B* claims.

Troubled by the absence of any avenue of review of Part B decisions in cases which pre-date the 1986 OBRA Amendments, courts created a "dichotomy" of types of Part B disputes that could be reviewed judicially. If a case arose out of a dispute over the *amount* of reimbursement on a particular claim or claims, there was no entitlement to judicial review, at all.

*See, United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982).

If, however, the claim involved the *method* employed in assessing whether Medicare Part B benefits were payable, a suit could be brought pursuant to 28 U.S.C. § 1331. The leading case in this latter category was *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

In *Michigan Academy,* the plaintiffs challenged a Medicare regulation that allowed payment of benefits in different amounts for similar services under Part B of the Medicare Act, the amount of payment being controlled by whether or not the physician-provider was "board certified". Several doctors alleged that the regulation was in violation of the Medicare statute and of the due process and equal protection clauses of the Fifth Amendment of the U.S. Constitution.

The Supreme Court held that judicial review *was* available for a challenge to the *method* by which benefit amounts were calculated, and that 28 U.S.C. § 1331 was available as a vehicle to obtain such review. In reaching that conclusion, the Court distinguished the *Erika* case, explaining that that case involved a challenge to the *amount* of benefits as opposed to the *method* by which such amounts were determined. 476 U.S. at 674–77, 106 S.Ct. at 2138–2139.

Of critical importance to the outcome in *Michigan Academy* was the court's determination that no administrative or judicial avenue of review was otherwise provided for resolution of statutory or constitutional challenges to regulations relating to Part B claims. 476 U.S. at 674–75, 106 S.Ct. at

---

**6.** Prepayment utilization review is consistent with the reporting requirements contemplated by the Medicare statute. 42 U.S.C. § 1395*l*(e) provides:

> No payment shall be made to any provider of services ... unless there has been furnished such information as may be necessary in order to determine the amounts due such provider ...

**7.** Although Section 1395ff(b)(1)(C) speaks only of "the *amount* of benefits under part A", the

Supreme Court held in *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) that the exhaustion of administrative remedies requirements then applicable only to Part A claims were also applicable to Part A "method" disputes. (See discussion of this term and the "amount vs. method dichotomy", *infra* in this Opinion and Order.) Thus, the *Ringer* court held that a court could not entertain a method challenge absent complete exhaustion of administrative remedies.

2138.[8]

■ Plaintiff in this case argues that his challenge to being placed on PPUR is a *Michigan Academy* "method" challenge. He contends that his PPUR claim is identical to the Medicare regulations challenge of the physicians in *Michigan Academy* because he was placed on PPUR pursuant to a rule authorizing the prepayment review practice in the Medicare Carrier's Manual, and that it is the "method" by which BCBSM *applied* that rule with respect to Dr. Farkas's billings that the doctor is challenging. Thus, he argues that *Michigan Academy* squarely controls his case.

The Court finds that Plaintiff's arguments are without legal merit.

■ First, the Court finds no legal support for Plaintiff's contention that his challenge of the "method" by which BCBSM applied the Medicare Carrier's Manual PPUR placement provisions to him rises to the level of a judicially reviewable *Michigan Academy* "method". As the court explained in *Kuritzky v. Blue Shield of Western New York*, 850 F.2d 126 (2d Cir. 1988), a "method" challenge is only reviewable in a judicial action if it involves a challenge of the *validity* of rules, regulations and statutes, and *not* the carrier's method of applying the rules or regulations. *Id.* at 128.

The Sixth Circuit adopted the *Kuritzky* court's rationale in *Association of Seat Lift Manufacturers v. Bowen*, 858 F.2d 308 (6th Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989). In *Seat Lift*, the Court of Appeals affirmed the district court's dismissal of the action on lack of jurisdiction grounds because the purported "methodology" challenges asserted by the plaintiffs in that case "did not involve the *statutory or regulatory* method used.... [O]nly the *implementation* of a method, *not the* [regula-

tory] *method itself*, was at issue." *Id.* at 317 (some emphasis added). *See also, Mobile Medical Services, Inc. v. Arkansas Blue Cross and Blue Shield*, 676 F.Supp. 194 (W.D.Ark.1987) (action filed by medical service provider to enjoin Blue Cross (the designated Medicare carrier for the state of Arkansas) from trying to collect repayment of bills for non-covered services was dismissed for lack of jurisdiction where plaintiff was not challenging the validity of a statutory provision or a regulation but only Blue Cross's method of applying regulatory provisions).

Plaintiff, here, is in precisely the same position as the plaintiffs in *Kuritzky*, *Seat Lift* and *Mobile Medical Services*. Dr. Farkas admits that he is not challenging the constitutionality or validity of the Medicare rules authorizing PPUR review. Rather, he admits that he is only challenging the carrier's *application* of the Medicare rules to him *personally*.

By application of the authorities cited above, the Court determines that Plaintiff has not made out a judicially reviewable *Michigan Academy* "method" challenge so as to confer jurisdiction upon this Court to entertain this lawsuit.

C. THE EFFECT OF THE 1986 AMENDMENTS ON THE MICHIGAN ACADEMY RULE

Even if the Court were to find that Dr. Farkas has presented a *Michigan Academy*-type "method" challenge in this case, as discussed above, *Michigan Academy* was decided *before* § 1395ff(b)(1)(C) was amended to extend the Part A administrative review and exhaustion-of-administrative-remedies-requirements-for judicial-review provisions to Part B disputes. The OBRA amendment that was enacted several months after *Michigan Academy* was decided, on October 27, 1986 (which was made applicable to items or services provided on or after January 1, 1987), extended

---

**8.** By contrast, with respect to Part A claims and Part B "amount" challenges, the Court noted that at least limited administrative carrier "fair hearing" review was available. 476 U.S. at 674–75, 106 S.Ct. at 2138. However, "the legality, constitutional or otherwise, of any provision of the Act or regulations relevant to the Medicare Program is not considered in a 'fair hearing' held by a carrier to resolve a grievance related to a determination of the amount of a Part B award." *Id.*

review under § 1395ff(b)(1)(C) to disputes relating to Part B claims, as well as Part A claims.

> Section 1395ff(b) now reads as follows: (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—
>
>     \*    \*    \*    \*    \*    \*
>
> (C) the amount of benefits under part A *or part B* of this subchapter (including a determination where such amount is determined to be zero)....
> shall be entitled to a hearing thereon by the Secretary ... and to judicial review of the Secretary's final decision after such hearing....

Thus, the administrative/judicial review scheme is now precisely the same for Part A and Part B claims, and the absence of an avenue of administrative dispute resolution which troubled the *Michigan Academy* court no longer exists.

The reasonable conclusion, as at least one other court has found, is that in light of the 1986 OBRA amendment of 42 U.S.C. § 1395ff(b)(1)(C), the amount/methodology dichotomy is no longer relevant, and *Michigan Academy* is of no continuing precedential value. *See National Kidney Patients Association v. Sullivan,* 958 F.2d 1127, 1132–1134 (D.C.Cir.1992).

The *National Kidney Patients* court explained the effect of the 1986 amendment of Section 1395ff on the *Michigan Academy* rule:

> In two cases decided before the October 1986 amendment, the Supreme Court interpreted the statutes application to Medicare part B. In the first, *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), it found that the statute precluded any judicial review of "determinations of the amount of Part B. Awards." *Id.* at 208, 102 S.Ct. at 1654. This followed rather straightforwardly from § 1395ff(b)'s provision

for review "of any determination ... as to ... the amount of benefits under part A", coupled with § 1395ii's incorporation of § 405(h)'s preclusion rule. The Court also noted legislative history indicating congressional concern that otherwise the courts might be flooded with "minor matters". *Id.* at 209, 102 S.Ct. at 1655.

Four years later—but four months *before* Congress amended § 1395ff(b) to extend subsection (1)(C)'s coverage to part B—the Court found that the preclusion as to part B claims did not encompass attacks on the *method* by which the Secretary determined part B amounts. In *Bowen v. Michigan Academy of Family Physicians,* the Court stressed the "strong presumption that Congress intends judicial review of administrative action", 476 U.S. at 670, 106 S.Ct. at 2135, and declined to "indulge the Government's assumption that Congress ... intended no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B", *id.* at 680, 106 S.Ct. at 2141....

> If judicial review of Medicare part B disputes is still governed by the amounts/methodology distinction of *Michigan Academy,* [the health care provider's] attack .... would seem to fall squarely on the methodology line....

**We think, however, that the October 1986 amendment makes the *Eldridge–Ringer*[9] line of authority the sole determinant of jurisdiction for Medicare claims, both parts A and B. First, it seems inescapable that the same rule must govern parts A and B; the special treatment of part B, based on the pre-October 1986 statutory differences, cannot survive the elimination of those differences.** While the House Report accompanying the amendment focused on adding judicial review for part B claimants who previously enjoyed none (i.e., ones asserting only "amounts" claims), it

---

**9.** What the *National Kidney* court referred to as the *"Eldridge–Ringer* line" is the line of cases applying the Supreme Court's decisions in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984),

in which the Court set forth the rule that complete and full exhaustion of administrative remedies provided in the Medicare Act was a "nonwaivable" prerequisite to judicial review of part A disputed claims.

also explained that the amendment established "an appeals procedure under Part B that is modeled after that available under Part A." H.R.Rep. No. 727, 99th Cong., 1st Sess. 95, reprinted in 1986 U.S.C.C.A.N. 3607, 3685. **There is, indeed no difference in the statutory provisions governing judicial review of parts A and B,** at least insofar as plaintiffs may be affected.

\*     \*     \*     \*     \*     \*

Second, as our summary of *Michigan Academy* makes clear, the Court rested the decisions largely on the presumption of reviewability which would have been completely defeated if § 1395ff(b)(1)(C)'s pre-October 1986 exclusion of part B were read to encompass methodology disputes. **With the October 1986 amendment, part B claims will not go unreviewed; review simply awaits** *initial* **administrative determination in a concrete setting.**

\*     \*     \*     \*     \*     \*

The October 21, 1986 amendment makes clear that persons affected by an adverse decision of a *carrier* may now obtain review *by the Secretary,* see 42 U.S.C. § 1395ff(b)(1) (1988), so that the administrative structure is plainly available to

correct whatever systemic flaws may be ascribed to carriers.... [The *Michigan Academy* court] not unnaturally found an anomaly in consigning final resolution of methodology disputes to entities which lacked the competence or authority to resolve them. **Given the October 1986 amendments, [no longer are] methodology disputes [left] in the hands of carriers; it simply means that they are fed through the administrative-judicial system as parts of disputes over actual amounts.**

*Id.* at 1133 (emphasis in original).[10] *See also, Cardiäc Monitoring Services, Inc. v. Blue Cross and Blue Shield of Arkansas,* No. LR–C–92–01 (E.D.Ark.1992) (unpublished Aug. 6, 1992 Opinion and Order); *Colorado Clinical Labs, Inc. v. Newman,* Medicare & Medicaid Guide P39,056, 1990 WL 282590 (N.D.Tex.1990); and *Oxygen Equipment Co., Inc. v. Sullivan,* Medicare & Medicaid Guide, P37,989, 1989 WL 107596 (N.D.Ala.1989), all holding that the *Michigan Academy* rule regarding direct judicial review of "method" claims is no longer good law in light of the 1986 amendments of the Medicare Act providing for administrative review of Part B claims. *Cf., Pulmocare Pharmacy, Inc. v. Sulli-*

---

**10.** Plaintiff argues that the Court should not follow the *National Kidney Patients* case because he contends that the court in that case was in error. He contends that the *Michigan Academy* method vs. amount dichotomy survives the 1986 amendment, and cites as his principal authority for that contention *Association of Seat Lift Manufacturers v. Bowen,* 858 F.2d 308 (6th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989). Apparently, Plaintiff wants the Court to ignore the facts of that case and focus solely on the date of the decision, and find that the *Michigan Academy* case—which undisputedly was relied upon by the Sixth Circuit in *Seat Lift*—is still good law. The facts of the case, however, undermine Plaintiff's argument.

*Seat Lift* involved Part B claims that were submitted to Ohio's Medicare carrier *in 1984–1985.* 858 F.2d at 311–314. The lawsuit itself, in fact, was filed *in August 1985. Id.* at 314. The amendment to Section 1395ff of the Medicare Act which the *National Kidney Patients* court held effectively overruled *Michigan Academy* was not enacted until *October 1986* and was expressly made applicable only to items or ser-

vices provided *on or after January 1, 1987.* The 1986 amendment, therefore, was clearly inapplicable in *Seat Lift,* and, hence, the court's application of *Michigan Academy* is understandable.

Similarly, the other cases relied upon by Dr. Farkas all involved pre-October 1986 carrier decisions regarding Part B claims for pre-January 1987 items or services. *See, Texas Medical Association v. Sullivan,* 875 F.2d 1160, 1162 (5th Cir.1989), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989) (suit involved physician fees for services provided October 1985–April 1986). *McCuin v. Secretary of Health and Human Services,* 817 F.2d 161, 163 (services provided in 1981; suit filed in 1984) (1st Cir. 1987), and *Bodimetric Health Services, Inc. v. Aetna Life & Casualty,* 706 F.Supp. 619, 622–623 (N.D.Ill.1989), *aff'd,* 903 F.2d 480 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990) (suit challenged 1985 Part B claim review procedure and resulting denial of Medicare claims for services provided in that year). Hence, the 1986 amendment to Section 1395ff had no application in those cases.

*van,* Medicare & Medicaid Guide P40,387, 1992 WL 226932 (D.Ore.1992).[11]

This Court agrees with the Circuit Court of the District of Columbia, and the District Courts of Arkansas, Texas and Alabama—in light of the 1986 Medicare Act amendments, whether this is a *method* case versus an *amount* case is no longer of any significant relevance for purposes of determining whether this Court has jurisdiction to review BCBSM's PPUR-placement decision. This Court finds that by application of the 1986 Medicare Act amendments, review of BCBSM's decision to place Dr. Farkas on Medicare Prepayment Utilization Review is a matter to be resolved in the first instance by resort to the exclusive dispute resolution provisions of 42 U.S.C. § 405(g). Therefore, the Court determines that it lacks jurisdiction to adjudicate Dr. Farkas's claim until he has fully and completely exhausted his administrative remedies, and this case must, accordingly be dismissed.[12]

**11.** In *Pulmocare,* the court declined to follow *National Kidney Patients* and refused to find that the 1986 amendments precluded direct judicial review of the plaintiff's claims in that case.

Although this Court finds *National Kidney Patients* to reflect the better rule, i.e., that *all* Part B claims—whether they be "amount" or "method" claims—are now (post–1986 amendments) *ab initio* subject to exhaustion of administrative remedies before judicial review becomes available, even if this Court were to agree with the Oregon District Court's reasoning regarding the continued post–1986 availability of direct judicial review of *Michigan Academy* "method" challenges, such agreement would not mandate an alteration of the Court's disposition of this case.

In *Pulmocare,* the plaintiff was challenging the *validity of a Medicare regulatory policy* which the plaintiff claimed was implemented by the Secretary of HHS in violation of the procedural requirements established by the Medicare Act, the APA and the FOIA. As such, the *Pulmocare* challenge was precisely the type of challenge of the validity/legality of a directive, policy, rule, regulation or statute characterized by the *Michigan Academy* court as a "method" challenge. By contrast, as discussed *supra* in this Opinion and Order, this Court does not find that the decision to place Dr. Farkas on PPUR in this case implicates the kind of directive, policy or regulation that rises to the level of "method" engendering the due process considerations of *Michigan Academy.*

**12.** Moreover, even assuming *arguendo* that Plaintiff were not entitled to administrative re-

## III. CONCLUSION

For all of the reasons set forth above in this Opinion and Order, .

NOW, THEREFORE,

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss be, and hereby are, GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED without prejudice to Plaintiffs' right to obtain judicial review after having exhausted their extra-judicial administrative remedies under the Medicare Act, if the amount in controversy requirements mandated in the statute are satisfied.

IT IS FURTHER ORDERED that the Temporary Restraining Order previously entered by the Court be, and hereby is, VACATED.

view of his placement on PPUR, this is not to say that Dr. Farkas will be left with no avenue of redress forever. Once he begins submitting claims under the PPUR, if those claims are denied, if the amount paid is less than what he believes is appropriate, or if the claims are not acted upon within a reasonable time, Dr. Farkas will be able to take advantage of the full array of administrative and judicial remedies set forth in the Act, assuming the amount in controversy requirements are satisfied.

Plaintiff, nonetheless, complains of the "legality" of his PPUR placement, simply on the ground that he will now have to submit documentation with his Medicare billings, and this documentation requirement is "time consuming", "burdensome" and "onerous". These very same arguments were raised by the plaintiff and rejected by the court in the *Colorado Clinical Labs* case, *supra.*

Moreover, in this case, in light of the fact that the Medicare Act and the regulations clearly and explicitly provide that payment shall not be issued unless the necessary information to determine the amount due has been provided, *see* 42 U.S.C. § 1395*l*(e) and 42 C.F.R. § 405.252(a), Plaintiff can hardly claim that BCBSM's PPUR documentation requirement is illegal. And, since Plaintiff is not being denied his right to challenge individual claims which are denied or on which he is paid less than what he expected, or which BCBSM does not process in a reasonably timely manner, the Court sees no due process implications, either.