BOWEN, SECRETARY OF HEALTH AND HUMAN
SERVICES, ET AL. *v.* MICHIGAN ACADEMY
OF FAMILY PHYSICIANS ET AL.

No. 85–225.   Argued January 22, 1986—Decided June 9, 1986

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except REHNQUIST, J., who took no part in the consideration or decision of the case.

*Edwin S. Kneedler* argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *Anthony J. Steinmeyer.*

*Alan G. Gilchrist* argued the cause and filed a brief for respondents.*

JUSTICE STEVENS delivered the opinion of the Court.

The question presented in this case is whether Congress, in either § 1395ff or § 1395ii of Title 42 of the United States Code, barred judicial review of regulations promulgated under Part B of the Medicare program.

Respondents, who include an association of family physicians and several individual doctors, filed suit to challenge the validity of 42 CFR § 405.504(b) (1985), which authorizes the payment of benefits in different amounts for similar physicians' services. The District Court held that the regulation contravened several provisions of the statute governing the Medicare program:

> "There is no basis to justify the segregation of allopathic family physicians from all other types of physicians. Such segregation is not rationally related to any legitimate purpose of the Medicare statute. To lump MDs who are family physicians, but who have chosen not

---

*\*Jack R. Bierig* filed a brief for the American Medical Association as *amicus curiae* urging affirmance.

to become board certified family physicians for whatever motive, with chiropractors, dentists, and podiatrists for the purpose of determining Medicare reimbursement defies all reason." *Michigan Academy of Family Physicians* v. *Blue Cross and Blue Shield of Michigan,* 502 F. Supp. 751, 755 (ED Mich. 1980).

Because it ruled in favor of respondents on statutory grounds, the District Court did not reach their constitutional claims. See *id.*, at 756. The Court of Appeals agreed with the District Court that the Secretary's regulation was "obvious[ly] inconsisten[t] with the plain language of the Medicare statute" and held that "this regulation is irrational and is invalid." *Michigan Academy of Family Physicians* v. *Blue Cross and Blue Shield of Michigan,* 728 F. 2d 326, 332 (CA6 1984). Like the District Court, it too declined to reach respondents' constitutional claims. See *id.*, at 332, n. 5.

The Secretary of Health and Human Services has not sought review of the decision on the merits invalidating the regulation. Instead, he renews the contention, rejected by both the District Court and the Court of Appeals, that Congress has forbidden judicial review of all questions affecting the amount of benefits payable under Part B of the Medicare program. Because the question is important and has divided the Courts of Appeals,[1] we granted the petition for a writ of certiorari.[2] We now affirm.

---

[1] The Court of Appeals for the Fourth Circuit, in conflict with the Court of Appeals for the Sixth Circuit, has held that regulations promulgated under Part B of the Medicare program are insulated from judicial review. See *Starnes* v. *Schweiker,* 748 F. 2d 217, 218 (1984) *(per curiam),* cert. denied, 471 U. S. 1017 (1985).

[2] In fact, we did so twice. We first granted the petition for a writ of certiorari to allow the Court of Appeals to consider its jurisdictional ruling in the light of *Heckler* v. *Ringer,* 466 U. S. 602 (1984). 467 U. S. 1223 (1984). On remand, the Court of Appeals ultimately decided to reinstate its original judgment, see *Michigan Academy of Family Physicians* v. *Blue Cross and Blue Shield of Michigan,* 757 F. 2d 91 (1985); *Michigan Academy of Family Physicians* v. *Blue Cross and Blue Shield of Michi-*

■■■■■■■■■■■■■■■■■■■

## I

We begin with the strong presumption that Congress intends judicial review of administrative action. From the beginning "our cases [have established] that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (citing cases). See generally L. Jaffe, Judicial Control of Administrative Action 339–353 (1965). In *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803), a case itself involving review of executive action, Chief Justice Marshall insisted that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws." Later, in the lesser known but nonetheless important case of *United States* v. *Nourse*, 9 Pet. 8, 28–29 (1835), the Chief Justice noted the traditional observance of this right and laid the foundation for the modern presumption of judicial review:

> "It would excite some surprise if, in a government of laws and of principle, furnished with a department whose appropriate duty it is to decide questions of right, not only between individuals, but between the government and individuals; a ministerial officer might, at his discretion, issue this powerful process . . . leaving to the debtor no remedy, no appeal to the laws of his country, if he should believe the claim to be unjust. But this anomaly does not exist; this imputation cannot be cast on the legislature of the United States."

Committees of both Houses of Congress have endorsed this view. In undertaking the comprehensive rethinking of the place of administrative agencies in a regime of separate and

*gan,* 751 F. 2d 809 (1984), whereupon we issued the writ on which the judgment is now before us. 474 U. S. 815 (1985).

divided powers that culminated in the passage of the Administrative Procedure Act (APA), 5 U. S. C. §§ 551–559, 701–706, the Senate Committee on the Judiciary remarked:

> "Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board." S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945).

Accord, H. R. Rep. No. 1980, 79th Cong., 2d Sess., 41 (1946). The Committee on the Judiciary of the House of Representatives agreed that Congress ordinarily intends that there be judicial review, and emphasized the clarity with which a contrary intent must be expressed:

> "The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." *Ibid.*

Taking up the language in the House Committee Report, Justice Harlan reaffirmed the Court's holding in *Rusk* v. *Cort*, 369 U. S. 367, 379–380 (1962), that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories* v. *Gardner*, 387 U. S., at 141 (citations omitted). This standard has been invoked time and again when

considering whether the Secretary has discharged "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision," *Dunlop* v. *Bachowski*, 421 U. S. 560, 567 (1975).[3]

Subject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby

---

[3] See, *e. g.*, *Lindahl* v. *Office of Personnel Management*, 470 U. S. 768, 778 (1985); *Dunlop* v. *Bachowski*, 421 U. S., at 567; *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 410 (1971); *Barlow* v. *Collins*, 397 U. S. 159, 166–167 (1970) ("Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated"). See also *Wong Wing Hang* v. *INS*, 360 F. 2d 715, 718 (CA2 1966) (Friendly, J.) ("[O]nly in the rare—some say non-existent—case . . . may review for 'abuse' be precluded"). Of course, this Court has "never applied the 'clear and convincing evidence' standard in the strict evidentiary sense"; nevertheless, the standard serves as "a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 350–351 (1984).

A strong presumption finds support in a wealth of scholarly literature. See, *e. g.*, 2 K. Davis, Administrative Law § 9:6, p. 240 (1979) (praising "the case law since 1974" for being "strongly on the side of reviewability"); L. Jaffe, Judicial Control of Administrative Action 327 (1965) ("An agency is not an island entire of itself. It is one of the many rooms in the magnificent mansion of the law. The very subordination of the agency to judicial jurisdiction is intended to proclaim the premise that each agency is to be brought into harmony with the totality of the law, the law as it is found in the statute at hand, the statute book at large, the principles and conceptions of the 'common law,' and the ultimate guarantees associated with the Constitution"); B. Schwartz, Administrative Law § 8.1, p. 436 (2d ed. 1984) ("The responsibility of enforcing the limits of statutory grants of authority is a judicial function; . . . [w]ithout judicial review, statutory limits would be naught but empty words"); Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 432 (1958) ("[J]udicial review is the rule. . . . It is a basic right; it is a traditional power and the intention to exclude it must be made specifically manifest"); Shapiro, Administrative Discretion: The Next Stage, 92 Yale L. J. 1487, 1489, n. 11 (1983) (since passage of the APA, the sustained effort of administrative law has been to "continuously narro[w] the category of actions considered to be so discretionary as to be exempted from review").

courts review agency action. The presumption of judicial review is, after all, a presumption, and "like all presumptions used in interpreting statutes, may be overcome by," *inter alia*, "specific language or specific legislative history that is a reliable indicator of congressional intent," or a specific congressional intent to preclude judicial review that is "'fairly discernible' in the detail of the legislative scheme." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 349, 351 (1984).[4]

In this case, the Government asserts that two statutory provisions remove the Secretary's regulation from review under the grant of general federal-question jurisdiction found in 28 U. S. C. § 1331. First, the Government contends that 42 U. S. C. § 1395ff(b) (1982 ed., Supp. II), which authorizes "Appeal by individuals," impliedly forecloses administrative or judicial review of any action taken under Part B of the Medicare program by failing to authorize such review while simultaneously authorizing administrative and judicial review of "any determination . . . as to . . . the amount of benefits under part A," § 1395ff(b)(1)(C). Second, the Government asserts that 42 U. S. C. § 1395ii (1982 ed., Supp. II), which makes applicable 42 U. S. C. § 405(h) (1982 ed., Supp. II), of the Social Security Act to the Medicare program, expressly precludes all administrative or judicial review not otherwise provided in that statute. We find neither argument persuasive.

---

[4] "The congressional intent necessary to overcome the presumption may also be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it, see, *e. g., Ludecke* v. *Watkins*, 335 U. S. 160 (1948), or from the collective import of legislative and judicial history behind a particular statute, see, *e. g., Heikkila* v. *Barber*, 345 U. S. 229 (1953). More important for purposes of this case, the presumption favoring judicial review of administrative action may be overcome by inferences of intent drawn from the statutory scheme as a whole. See, *e. g., Morris* v. *Gressette*, 432 U. S. 491 (1977); *Switchmen* v. *National Mediation Board*, 320 U. S. 297 (1943)." *Block* v. *Community Nutrition Institute*, 467 U. S., at 349.

## II

Section 1395ff on its face is an explicit authorization of judicial review, not a bar.[5] As a general matter, "'[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.'" *Abbott Laboratories* v. *Gardner*, 387 U. S., at 141 (quoting L. Jaffe, Judicial Control of Administrative Action 357 (1965)). See *Barlow* v. *Collins*, 397 U. S. 159, 166 (1970); *Stark* v. *Wickard*, 321 U. S. 288, 309 (1944).

In the Medicare program, however, the situation is somewhat more complex. Under Part B of that program, which is at issue here, the Secretary contracts with private health insurance carriers to provide benefits for which individuals voluntarily remit premiums. This optional coverage, which is federally subsidized, supplements the mandatory institu-

---

[5] The pertinent text of § 1395ff reads as follows:

"(a) Entitlement to and amount of benefits

"The determination of whether an individual is entitled to benefits under part A or part B, and the determination of the amount of benefits under part A, shall be made by the Secretary in accordance with regulations prescribed by him.

"(b) Appeal by individuals

"(1) Any individual dissatisfied with any determination under subsection (a) of this section as to —

"(A) whether he meets the conditions of section 426 or section 426a of this title [which set forth eligibility requirements to be satisfied before an individual is permitted to participate in Part A of the Medicare program], or

"(B) whether he is eligible to enroll and has enrolled pursuant to the provisions of part B of [the Medicare program] . . . , or,

"(C) the amount of the benefits under part A (including a determination where such amount is determined to be zero)

shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title."

tional health benefits (such as coverage for hospital expenses) provided by Part A. Subject to an amount-in-controversy requirement, individuals aggrieved by delayed or insufficient payment with respect to benefits payable under Part B are afforded an "opportunity for a fair hearing by the *carrier,*" 42 U. S. C. § 1395u(b)(3)(C) (emphasis added); in comparison, and subject to a like amount-in-controversy requirement, a similarly aggrieved individual under Part A is entitled "to a hearing thereon by the *Secretary* . . . and to judicial review," 42 U. S. C. §§ 1395ff(b)(1)(C), (b)(2) (1982 ed. and Supp. II). "In the context of the statute's precisely drawn provisions," we held in *United States* v. *Erika, Inc.,* 456 U. S. 201, 208 (1982), that the failure "to authorize further review for determinations of the amount of Part B awards . . . provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims." Not limiting our consideration to the statutory text, we investigated the legislative history which "confirm[ed] this view," *ibid.,* and disclosed a purpose to "'avoid overloading the courts'" with "'trivial matters,'" a consequence which would "'unduly ta[x]'" the federal court system with "'little real value'" to be derived by participants in the program, *id.,* at 210, n. 13 (quoting 118 Cong. Rec. 33992 (1972) (remarks of Sen. Bennett)).

Respondents' federal-court challenge to the validity of the Secretary's regulation is not foreclosed by § 1395ff as we construed that provision in *Erika.* The reticulated statutory scheme, which carefully details the forum and limits of review of "any determination . . . of . . . the amount of benefits under part A," 42 U. S. C. § 1395ff(b)(1)(C) (1982 ed., Supp. II), and of the "amount of . . . payment" of benefits under Part B, 42 U. S. C. § 1395u(b)(3)(C), simply does not speak to challenges mounted against the *method* by which such amounts are to be determined rather than the *determinations* themselves. As the Secretary has made clear, "the legality, constitutional or otherwise, of any provision of

the Act or regulations relevant to the Medicare Program" is not considered in a "fair hearing" held by a carrier to resolve a grievance related to a determination of the amount of a Part B award.[6] As a result, an attack on the validity of a regulation is not the kind of administrative action that we described in *Erika* as an "amount determination" which decides "the amount of the Medicare payment to be made on a particular claim" and with respect to which the Act impliedly denies judicial review. 456 U. S., at 208.

That Congress did not preclude review of the method by which Part B awards are computed (as opposed to the computation) is borne out by the very legislative history we found persuasive in *Erika.* The Senate Committee Report on the original 1965 legislation reveals an intention to preclude "judicial review of a determination concerning the *amount of benefits* under part B where claims will probably

---

[6] Medicare Carrier's Manual § 12016 (1985). In a "fair hearing" conducted pursuant to § 1395u(b)(3)(C), see 42 CFR § 405.820 (1985), the carrier designates a hearing officer, § 405.823, whose jurisdiction is circumscribed by regulation as follows:

"The hearing officer in exercising the authority to conduct a hearing under section 1842(b)(3)(C) of the Act is to comply with all the provisions of title XVIII of the Act and regulations issued thereunder, as well as with policy statements, instructions, and other guides issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the carriers." § 405.860.

One of those guides is a compilation of instructions prepared by the Secretary and entitled the "Carrier's Manual." Section 12016 of the Manual, part of which is quoted in text, provides as follows:

"Authority—the HO [Hearing Officer] occupies a significant position in the administration appeals process. Authority of the HO is limited to the extent that he must comply with all provisions of title XVIII of the Act and regulations issued thereunder, as well as with HCFA. The HO may not overrule the provisions of the law or interpret them in a way different than HCFA does when he disagrees with their intent; nor may he use hearing decisions as a vehicle for commenting upon the legality, constitutional or otherwise, of any provision of the Act or regulations relevant to the Medicare Program."

be for substantially smaller amounts than under part A." S. Rep. No. 404, 89th Cong., 1st Sess., 54–55 (1965) (emphasis added). The Report makes plain that "carriers, not the Secretary, would review beneficiary complaints regarding the *amount of benefits.*" *Ibid.* (emphasis added). Accord, H. R. Rep. No. 213, 89th Cong., 1st Sess., 47 (1965) ("Under the supplementary plan [Part B], carriers, not the Secretary, would review beneficiary complaints regarding the *amount of benefits*" (emphasis added)). The legislative history of the pertinent 1972 amendment likewise reveals that judicial review was precluded only as to controversies regarding determinations of amounts of benefits. The Conference Report on the 1972 amendment explains that "there is no authorization for an appeal to the Secretary or for judicial review on matters *solely involving amounts of benefits under Part B.*" H. R. Conf. Rep. No. 92–1605, p. 61 (1972) (emphasis added). Senator Bennett's introductory explanation to the amendment confirms that preclusion of judicial review of Part B awards—designed "to avoid overloading the courts with quite minor matters"—embraced only "decisions on a claim for payment for a given service." 118 Cong. Rec. 33992 (1972). The Senator feared that "[i]f judicial review is made available where any claim is denied, as some court decisions have held, the resources of the Federal court system would be unduly taxed and little real value would be derived by the enrollees. The proposed amendment would merely clarify the original intent of the law and prevent the overloading of the courts with trivial matters because the intent is considered unclear." *Ibid.* As we found in *Erika,* 456 U. S., at 206, Congress has precluded judicial review only "of adverse hearing officer determinations of the amount of Part B payments."[7]

---

[7] The fourth footnote of our opinion in *Heckler* v. *Ringer,* 466 U. S., at 608–609, n. 4, on which the Government relies for the proposition that Part B challenges are never cognizable in a judicial forum, merely declined to review "claims for Part B benefits." *Id.,* at 609, n. 4. The single sen-

Careful analysis of the governing statutory provisions and their legislative history thus reveals that Congress intended to bar judicial review only of determinations of the amount of benefits to be awarded under Part B. Congress delegated this task to carriers who would finally determine such matters in conformity with the regulations and instructions of the Secretary. We conclude, therefore, that those matters which Congress did *not* leave to be determined in a "fair hearing" conducted by the carrier—including challenges to the validity of the Secretary's instructions and regulations— are not impliedly insulated from judicial review by 42 U. S. C. § 1395ff (1982 ed. and Supp. II).

### III

In light of Congress' express provision for carrier review of millions of what it characterized as "trivial" claims, it is implausible to think it intended that there be *no* forum to adjudicate statutory and constitutional challenges to regulations promulgated by the Secretary. The Government nevertheless maintains that this is precisely what Congress intended to accomplish in 42 U. S. C. § 1395ii (1982 ed., Supp. II). That section states that 42 U. S. C. § 405(h) (1982 ed., Supp. II), along with a string citation of 10 other provisions of Title II of the Social Security Act, "shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter." Section 405(h), in turn, reads in full as follows:

"(h) Finality of Secretary's decision

---

tence in which we disposed of respondents' claim rested entirely on *Erika* and its companion case of *Schweiker* v. *McClure,* 456 U. S. 188 (1982). (*Schweiker* upheld the constitutionality of "fair hearing" proceedings conducted by private insurance carriers against a Due Process Clause attack.) We did not, in that single sentence, extend the preclusion of judicial review beyond the Part B "amount determinations" with which both *Erika* and that part of the *Ringer* opinion were concerned.

"The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter."

The Government contends that the third sentence of § 405(h) by its terms prevents any resort to the grant of general federal-question jurisdiction contained in 28 U. S. C. § 1331.[8]   It finds support for this construction in *Weinberger* v. *Salfi*, 422 U. S. 749, 756–762 (1975), and *Heckler* v. *Ringer*, 466 U. S. 602, 614–616, 620–626 (1984).   Respondents counter that the dispositions in these two cases are consistent with the view that Congress' purpose was to make clear that whatever specific procedures it provided for judicial review of final action by the Secretary were exclusive, and could not be circumvented by resort to the general jurisdiction of the federal courts.[9]   Cf. *Weinberger* v. *Salfi*, 422 U. S., at 764–765; *Heckler* v. *Ringer*, 466 U. S., at 621–622.

---

[8] The Government also argues that the challenged regulation is a "decision of the Secretary" which the second sentence of § 405(h) excepts from "revie[w] by any . . . tribunal."   The Government's assumption that the regulation is such a decision, however, ignores the contextual definition of "decision" in the first sentence as those determinations made by "the Secretary after a hearing."   The purpose of "the first two sentences of § 405(h)," as we made clear in *Weinberger* v. *Salfi*, 422 U. S. 749, 757 (1975), is to "assure that administrative exhaustion will be required."   Respondents' attack on the regulation here is not subject to such a requirement because there is no hearing, and thus no administrative remedy, to exhaust.

[9] See *Ellis* v. *Blum*, 643 F. 2d 68, 74 (CA2 1981) (Friendly, J.).   Cf. S. Rep. No. 734, 76th Cong., 1st Sess., 52 (1939); H. R. Rep. No. 728, 76th Cong., 1st Sess., 43–44 (1939).

Whichever may be the better reading of *Salfi* and *Ringer*, we need not pass on the meaning of § 405(h) in the abstract to resolve this case. Section 405(h) does not apply on its own terms to Part B of the Medicare program, but is instead incorporated *mutatis mutandis* by § 1395ii. The legislative history of both the statute establishing the Medicare program and the 1972 amendments thereto provides specific evidence of Congress' intent to foreclose review only of "amount determinations"—*i. e.*, those "quite minor matters," 118 Cong. Rec. 33992 (1972) (remarks of Sen. Bennett), remitted finally and exclusively to adjudication by private insurance carriers in a "fair hearing."[10] By the same token, matters which Congress did *not* delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law. In the face of this persuasive evidence of legislative intent, we will not indulge the Government's assumption that Congress contemplated review by carriers of "trivial" monetary claims, *ibid.*, but intended no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B of the Medicare program.[11] This is an extreme position, and one

---

[10] In this connection it bears mention that the legislative history summarized in the preceding section speaks to provisions for appeal generically, and is thus as probative of congressional intent in enacting § 1395ii as it is of § 1395ff. See S. Rep. No. 404, 89th Cong., 1st Sess., 54 (1965) *("Appeals")*; H. R. Rep. No. 213, 89th Cong., 1st Sess., 47 (1965) *("Appeals")*; H. R. Conf. Rep. No. 92–1605, p. 61 (1972) ("CLARIFICATION OF MEDICARE APPEAL PROCEDURES"); 118 Cong. Rec. 33991 (1972) ("DETERMINATIONS AND APPEALS") (caption to amendment proposed by Sen. Bennett).

[11] We do not believe that our decision will open the floodgates to millions of Part B Medicare claims. Unlike the *determinations* of amounts of benefits, the *method* by which such amounts are determined ordinarily affects vast sums of money and thus differs qualitatively from the "quite minor matters" review of which Congress confined to hearings by carriers. In addition, as one commentator pointed out, "permitting review only [of] . . . a particular statutory or administrative standard . . . would not result in a costly flood of litigation, because the validity of a standard can be readily

we would be most reluctant to adopt without "a showing of 'clear and convincing evidence,'" *Abbott Laboratories* v. *Gardner*, 387 U. S., at 141, to overcome the "strong presumption that Congress did not mean to prohibit all judicial review" of executive action, *Dunlop* v. *Bachowski*, 421 U. S., at 567. We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command. That presumption has not been surmounted here.[12]

---

established, at times even in a single case." Note, 97 Harv. L. Rev. 778, 792 (1984) (footnote omitted). We observed no flood of litigation in the first 20 years of operation of Part B of the Medicare program, and we seriously doubt that we will be inundated in the future.

[12] Our disposition avoids the "serious constitutional question" that would arise if we construed § 1395ii to deny a judicial forum for constitutional claims arising under Part B of the Medicare program. *Weinberger* v. *Salfi*, 422 U. S., at 762 (citing *Johnson* v. *Robison*, 415 U. S. 361, 366–367 (1974). See *Yakus* v. *United States*, 321 U. S. 414, 433–444 (1944); *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 84 (1936) (Brandeis, J., concurring); Gunther, Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate, 36 Stan. L. Rev. 895, 921, n. 113 (1984) ("[A]ll agree that Congress cannot bar all remedies for enforcing federal constitutional rights"). Cf. Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1378–1379 (1953). It also accords with our decision in *Schweiker* v. *McClure*, 456 U. S. 188 (1982), in which we resolved a constitutional challenge arising under Part B of the Medicare program. Although the Government notes, quite accurately, that our opinion in *McClure* makes no mention of the jurisdictional question, we can hardly be charged with overlooking that point. *McClure* was argued and announced the same day as *Erika*, a case which did concern the judicial competence to review a challenge arising under Part B; it was written by the same Member of this Court who authored *Erika*, immediately precedes *Erika* in the United States Reports, and contains a number of cross-references to that opinion. Finally, we cannot, as the Government would have us, dismiss respondents' constitutional attack as insubstantial—that is to say, "essentially fictitious," "obviously frivolous," and "obviously without merit"—under *Hagans* v. *Lavine*, 415 U. S. 528, 537 (1974) (internal quotations omitted), as would be necessary to decline jurisdiction over

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE REHNQUIST took no part in the consideration or decision of this case.

---

the case. Both courts below found the classification embodied in the regulation to be "irrational," see *supra*, at 668–669, and although this finding was made with respect to respondents' statutory claims, it surely casts sufficient doubt on the constitutionality of the classification under the Due Process and Equal Protection Clauses to merit resolution of the constitutional challenge.