**MIDWEST FAMILY CLINIC INC. d/b/a Mobile Doctors and Mobile Doctors Management, L.L.C., Plaintiffs,**

v.

**Donna SHALALA, Secretary of Health and Human Services and Health Care Service Corporation, Defendants.**

No. CIV. A. 97–40503.

United States District Court,
E.D. Michigan,
Southern Division.

March 4, 1998.

Andrew B. Wachler, Phyllis A. Avery, Abby L. Pendleton, Wachler & Kopson, Detroit, MI, for Plaintiffs.

Peter O. Caplan, Asst. U.S. Atty., Detroit, MI, for Defendants.

### MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

GADOLA, District Judge.

On Thursday, December 18, 1997 Midwest Family Clinic, Inc. (d/b/a Mobile Doctors), a Michigan corporation, and Mobile Doctors Management, L.L.C., a Michigan limited liability corporation, filed a Verified Complaint for Declaratory Judgment, Mandamus and Injunctive Relief. Plaintiffs also filed a motion for a temporary restraining order

("TRO") and preliminary injunction on that same day.[1]

On December 19, 1997, this court held a hearing on plaintiffs' motion for a TRO and preliminary injunction. At the hearing, plaintiffs' motion for a TRO was granted, and their motion for a preliminary injunction was taken under advisement.

Since the December 19, 1997 hearing, plaintiffs and defendants have filed supplemental briefs regarding plaintiffs' motion for a preliminary injunction. Upon a review of the supplemental briefs, the original pleadings, the arguments advanced at the hearing and all the relevant authorities, plaintiffs' motion for a preliminary injunction will be denied for the following reasons.

## FACTS

Plaintiffs Midwest Family Clinic, Inc. (hereinafter "Midwest") and Mobile Doctors Management, L.L.C. (hereinafter "MDM") are providers of "Part B" medical services to home-bound Medicare patients residing in Michigan and Illinois.[2] On September 26, 1997, Defendant Health Care Service Corporation ("HCSC"), a Medicare Part B "carrier,"[3] sent Midwest[4] a one-page letter (hereinafter "suspension letter") notifying Midwest and MDM of a decision to suspend their Medicare payments in accordance with 42 C.F.R. 405.371(a)(1), 405.372(a)(4). In relevant part the suspension letter read as follows:

Medicare payments have been suspended because the Health Care Financing Administration (HCFA) has reliable information of Medicare fraud including information that Midwest has been unbundling diagnostic tests by submitting Medicare claims on two different dates of service when the service was rendered on one date, that Midwest has submitted widespread billings for medically unnecessary services, and that Midwest has submitted Medicare claims for clinic visits that did not occur.

The suspension letter also advised plaintiffs of their right to challenge the suspension of their Medicare payments by submitting, within 15 days of the date of the suspension letter, a statement as to why they believed the suspension should be removed (hereinafter "rebuttal").

On October 3, 1997, plaintiffs sent a letter to the HCSC in response to the HCSC's September 26, 1997 suspension letter. In their October 3, 1997 letter to HCSC, plaintiffs requested more information regarding the bases for the suspension. Plaintiffs asserted that without such additional information, they could not provide a meaningful rebuttal.

Before the HCSC responded to plaintiffs' October 3, 1997 letter, plaintiffs sent a rebuttal letter dated October 10, 1997 to the HCSC explaining why they thought their payments should not be suspended. For in-

---

1. The defendants filed their response brief to plaintiffs' motion for a TRO and preliminary injunction on December 19, 1997.

2. The Medicare program consists of two parts. Part A of the of the program provides insurance for the cost of hospital and related post-hospital services. *Manakee Professional Medical Transfer Service v. Shalala*, 71 F.3d 574, 577 (6th Cir. 1995); *Cervoni v. Sec. of Health, Education and Welfare*, 581 F.2d 1010, 1012 (1st Cir.1978). Part A is not at issue herein. Part B establishes a voluntary program of "supplemental medical insurance" covering physician's charges and other medical services (e.g., diagnostic, home health and outpatient physical therapy services) for the aged and disabled. *Id.; Neurological Associates–H. Hooshmand, M.D., P.A. v. Bowen*, 658 F.Supp. 468, 469 (S.D.Fla.1987). *See also Schweiker v. McClure*, 456 U.S. 188, 190, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (describing Part B as "a private medical insurance program that is subsidized in

major part by the federal government"). Part B is at issue herein.

3. The Secretary of HHS is authorized by Congress to contract with entities called "carriers" to administer Part B of the Medicare program. 42 U.S.C. § 1395u. The carriers receive the actual requests for payments from beneficiaries or their assignees, determine whether the claims are covered by Medicare, and if so, determine the proper amount of payment and pay the claim. 42 U.S.C. § 1395u(a)(1)(A)—(C); *Neurological Associates–H.*, 658 F.Supp. at 469. Carriers also "assist in the application of safeguards against unnecessary utilization of services furnished by providers of services and other persons to individuals entitled to benefits under [Part B]...." 42 U.S.C. § 1395u(a)(2)(B).

4. The suspension letter was addressed to "Midwest Family Clinic" d/b/a "Mobile Doctors."

stance, plaintiffs argued that Midwest and MDM were two separate entities and if Midwest did anything wrong, MDM should not be implicated. Plaintiffs also contended that the HCSC failed to properly grant deference to the physicians' determination of medical necessity. Moreover, plaintiffs argued that the suspension of payments should be lifted because less drastic measures could be implemented that would fully protect and secure HCSC's interest (e.g., the posting of security by plaintiffs or the hiring of an independent billing company approved by HCSC).

By letter dated October 27, 1997, the HCSC informed plaintiffs that it had considered their rebuttal and had determined that there was no basis for the HCSC to terminate the suspension. In other words, the HCSC decided to continue the suspension of plaintiffs' Medicare payment. In its October 27, 1997 correspondence, the HCSC also responded to plaintiffs' request for additional information. The HCSC provided plaintiffs with more details concerning the investigation into plaintiffs' alleged fraudulent practices which ultimately led to the decision to suspend plaintiffs' Medicare benefits and invited plaintiffs to send a supplemental rebuttal.[5] In so doing, however, the HCSC made it patently clear that it believed the additional information it was providing was not required under the law.

On November 11, 1997, the plaintiffs sent a supplemental rebuttal stating that notwithstanding the additional information provided to them, they still could not provide any significant rebuttal. Plaintiffs insisted that

they needed even more information to prepare any meaningful rebuttal.

To date, the HCSC has refused to provide plaintiffs any additional information and has decided to continue the suspension of plaintiffs' Medicare payments. Consequently, on December 18, 1997, plaintiffs instituted this lawsuit against the HCSC and Donna Shalala, the Secretary of Health and Human Services ("HHS").[6] Plaintiffs argue that the suspension of their Medicare payments violates both their Fifth Amendment right to due process and their Fourth Amendment right to be free from unreasonable seizures. Plaintiffs also contend that the Secretary of HHS acted *ultra vires* in passing the various regulations which allow for the suspension of plaintiffs' Medicare payments. Moreover, plaintiffs bring a claim of trespass, conversion, and replevin, as well as a claim of mandamus.

## ANALYSIS

### The Regulations

Regulations issued December 2, 1996 authorize the suspension[7] of Medicare payments when, *inter alia*, "the intermediary, or the carrier possesses reliable information that an overpayment or fraud or willful misrepresentation exists." 42 C.F.R. § 405.371(a). The preamble to the regulations states that "[t]he purpose of suspending payment is to verify whether, and how much, payment was actually due the provider for past claims and to ensure that, if a provider or supplier was overpaid, sufficient funds are

---

5. For instance, the HCSC informed plaintiffs that it possessed evidence that from January, 1994 through June, 1996, plaintiffs had engaged in the impermissible practice of unbundling a number of diagnostic tests, including the duplex scan of the extra cranial arteries, echocardiography, and Doppler color flow velocity mapping. Also, the HCSC informed plaintiffs that it had evidence of plaintiffs' provision of medically unnecessary services, including proof that one of the plaintiffs' physicians had requested extensive cardiac testing on a Medicare beneficiary after that beneficiary reported to the physician that he/she had no history of cardiac problems nor any complaints of a cardiac problem. Moreover, the HCSC stated that it had collected evidence showing that plaintiffs had submitted claims for visits which did not occur, and specifically it had ob-

tained "a number of complaints from beneficiaries who denied that services billed by [plaintiffs] actually occurred."

6. HHS is the agency responsible for the administration of the Medicare program. The Secretary of HHS has delegated her responsibility for administering the Medicare Program to the Health Care Financing Administration ("HCFA"). Thus, the HCFA is the real party in interest in this litigation because it is responsible for the actions of the HCSC in suspending payments to providers or suppliers.

7. A "suspension" is a "withholding of payment by an intermediary or carrier of an approved Medicare payment amount." 42 C.F.R. 405.370.

available to recover the overpayment. These actions are clearly necessary to protect the Trust Funds from loss." 61 Fed.Reg. at 63742–63743.

A suspension is limited to 180 days. 42 C.F.R. § 405.372(d)(1).[8] However, in cases of fraud and misrepresentation, a one-time only extension of 180 days is available if the carrier, intermediary, the Office of Inspector General ("OIG") or a law enforcement agency is unable to complete its examination of information or investigation.[9] 42 C.F.R. § 405 .372(d)(2). Also, the HCFA, in very limited circumstances, may grant an additional extension of time if the Department of Justice submits a written request [10] to HCFA that the suspension of payment be continued based on an on-going investigation and anticipated filing of criminal and/or civil actions.[11] 42 C.F.R. § 405.372(d)(3)(ii).

Once the HCFA, intermediary or carrier determines that a suspension of payments should be put into effect, it must notify the provider or supplier of its intent to suspend payments, along with the reasons for the suspension.[12] 42 C.F.R. § 405.372(a). The provider or supplier is then afforded the opportunity to prepare a rebuttal. 42 C.F.R. § 405.372(b)(1). If the provider or supplier chooses to send a rebuttal, the carrier or intermediary must, within 15 days of receipt of the same, consider it together with other pertinent evidence submitted and determine whether the facts justify termination of the suspension. 42 C.F.R. § 405.375(a).

■ The decision to suspend benefits is not a final determination under 42 U.S.C. 405(h) (hereinafter " § 405(h)").[13] Ergo, it is not appealable. 42 C.F.R. § 405.375(c). *Neurological Associates—H. Hooshmand v. Bowen,* 658 F.Supp. 468, 471 (S.D.Fla.1987). The suspension, however, "may culminate in an appealable determination [under 405(h) . . . if the claims are subsequently denied," 61 Fed.Reg. at 63743, or if the provider is subsequently excluded from the Medicare program, *Clarinda Home Health v. Shalala,* 100 F.3d 526, 529 (8th Cir.1996).[14]

### Preliminary Injunction

■ Plaintiffs seek a preliminary injunction prohibiting the suspension of their benefits until they are given what they consider to be "adequate notice" regarding the decision to suspend along with "a prompt and meaningful opportunity" to challenge the suspension. In deciding whether a preliminary injunction should issue, this court must engage in a balancing test of the following four factors: (1) whether plaintiffs will suffer irreparable injury absent the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the

8. Regulations in effect prior to December 2, 1996 were substantially similar to the regulations in effect at the present time. The major differences between the "old" and "new" regulations is that the old regulations contained no time limits on the period of suspension of payments, while the new regulations contain such limits. Moreover, the old regulations did not provide for the submission of a rebuttal, but the new regulations do so provide.

9. The request for the 180–day extension must be made in writing to the HCFA.

10. The request must identify the entity under suspension, specify the amount of time needed to conduct the investigation and describe how the criminal and/or civil action will be affected if the suspension is not granted.

11. The time limits do not apply if the case has been referred to, and is being considered by, the OIG for administrative action.

12. There are exceptions to the prior notification requirements which are not relevant here. *See* 42 C.F.R. § 405.372(a)(2).

13. 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U .S.C. § 1395ii, provides that no action may be brought under 28 U.S.C. § 1331 and § 1346 to recover on any claim arising under this subchapter and "[n]o findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except" as provided in 42 U.S.C. § 405(g). Title 42, Section 405(g) provides for judicial review only after a plaintiff presents its claims to the Secretary and exhausts its administrative remedies.

14. Appeals are first taken to a carrier fair hearing officer, then to an Administrative Law Judge ("ALJ") and the Department of Appeals Board, and finally to a federal district court if the requisite amount in controversy requirements are met. 42 U.S.C. § 1395ff(b)(1) and (b)(2)(B); 42 U.S.C. § 405(g); 42 C.F.R. § 405.821; 42 C.F.R. § 405.855–856.

public interest would be served by issuance of the injunction; and (4) whether the movant has a "strong" likelihood of success on the merits. Fed.R.Civ.P. 65; *Sandison v. Michigan High School Athletic Ass'n. Inc.*, 64 F.3d 1026, 1030 (6th Cir.1995) (setting forth the factors to be weighed in assessing whether a preliminary injunction should issue). The issuance of a preliminary injunction lies within the sound discretion of the district court. *Id.;* Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, 11 A *Federal Practice and Procedure,* § 2951 (1995).

### A Preliminary Injunction Is Not Warranted Here

With the aforementioned four factors in mind, this court finds that a preliminary injunction is not warranted in this case. This court finds, for reasons set forth *infra*, that plaintiffs are not likely to succeed on the merits. Moreover, this court is of the opinion, as discussed *infra*, that the issuance of an injunction would cause severe harm to others and also the public interest.

### Likelihood of Success On the Merits

### Due Process Claim

Plaintiffs maintain that the suspension regulations run afoul of the Fifth Amendment. Specifically, plaintiffs claim that the regulations deprive them of procedural due process because they do not afford them any effectual means of challenging their suspension of Medicare payments.

■■■■ As an initial matter, the government contends that plaintiffs are not likely to succeed on their due process claim (or any of

their claims) because this court lacks subject matter jurisdiction over this action. This court finds that there is a serious question as to whether it has jurisdiction in this case.[15]

For example, plaintiffs allege subject matter jurisdiction under 28 U.S.C. § 1331.[16] Yet, it is well-established that 42 U.S.C. § 405(h) *precludes* a court's exercise of jurisdiction under 28 U.S.C. § 1331 for all claims "arising under" the Medicare Act and here, plaintiffs seemingly concede that their claims arise under said Act.[17] Thus, pursuant to 42 U.S.C. § 405(h), this court apparently lacks jurisdiction under § 1331.

Plaintiffs contend that in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Supreme Court carved out an exception to § 405(h) which is applicable in the case *sub judice* and which allows this court to exercise jurisdiction pursuant to 28 U.S.C. § 1331. *See McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 498, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). Specifically, in *Bowen*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623, the Supreme Court held that § 405(h) does not limit judicial review of claims arising under the Medicare Act when there is no other avenue of judicial relief. *See also Michigan Ass'n. of Homes and Services for the Aging, Inc. v. Shalala*, 127 F.3d 496, 501 (6th Cir.1997) (recognizing the *Bowen* exception); *Westchester Management Corp. v. U.S. Dep't. of HHS.*, 948 F.2d 279, 282 (6th Cir.1991), *cert. denied*, 504 U.S. 909, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992) (same). Plaintiffs maintain that judicial review of their challenges to the suspension of Medicare benefits is not prevented because there is no other avenue of judicial review.[18]

---

15. This court recognizes that there is a strong presumption in favor of judicial review of administrative action. *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 498, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

16. Plaintiffs also allege jurisdiction pursuant to 28 U.S.C. §§ 1361 and 2201.

17. Plaintiffs appear to have conceded that their claims "arise under" the Medicare Act, and this court finds that they do so arise. The Supreme Court has held that constitutional claims "arise under" the Medicare Act if the Act provides both the "standing and the substantive basis" for the

plaintiffs' claims, *Weinberger v. Salfi*, 422 U.S. 749, 756–61, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), as when the constitutional claims are "inextricably intertwined" with a claim for benefits, *Heckler v. Ringer*, 466 U.S. 602, 614, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). Furthermore, the Supreme Court has indicated that the "arising under" language of § 405(h) should be construed broadly. *Salfi*, 422 U.S. at 760–62.

18. Title 42, Section § 405(h) provides judicial review only as specified under § 405(g). § 405(g) allows for judicial review only "after a final decision by the Secretary made after a hearing to which he was a party." A "final decision" of the

At this time, this court is not persuaded that *Bowen* applies. Plaintiffs seemingly do have another avenue of judicial review to bring the claims they bring here. Specifically, plaintiffs can challenge the constitutionality of the suspension regulations after the Secretary makes a final determination regarding whether payments should be made to plaintiffs and/or whether plaintiffs should be excluded from the Medicare program.

Moreover, this court has grave doubts regarding its jurisdiction in the case *sub judice* since two Circuits which have confronted this precise question have found jurisdiction lacking. In *Clarinda Home Health v. Shalala*, 100 F.3d 526, 530–31 (8th Cir.1996), the Eighth Circuit found that it lacked jurisdiction over a constitutional challenge to the suspension of Medicare benefits. Likewise, in *Homewood Professional Care Center, Ltd. v. Heckler*, 764 F.2d 1242, 1249 (7th Cir.1985), the Seventh Circuit concluded that it lacked jurisdiction to hear a claim challenging the suspension regulations on constitutional grounds. *See also Neurological Associates—H. Hooshmand, M.D., P.A. v. Bowen*, 658 F.Supp. 468, 472 (S.D.Fla. 1987) (finding no jurisdiction to hear plaintiff's constitutional challenge to suspension regulations; no discussion of whether *Bowen* exception applicable). *But see Krebsbach, M.D. v. Heckler*, 617 F.Supp. 548, 550 (D.Ne.1985) (holding that court had jurisdiction to determine whether suspension of benefits without a hearing violated plaintiff's due process rights since "there is no review available of defendants' refusal to provide plaintiff with a hearing regarding the suspension of reimbursements" under the Medicare Act).

■ This court need not definitively resolve the jurisdictional question at this time.[19] Suffice it is to say that the great weight of authority seems to be against a finding of jurisdiction in this case and given this state of the law, it is unlikely plaintiffs will be able to prevail in this litigation.

■ Assuming arguendo, that this court has jurisdiction, this court finds that the plaintiffs are not likely to succeed on their due process claim for other reasons. Plaintiffs' procedural due process claim is threefold. First, plaintiffs claim that they have been deprived of due process because they have not been given detailed explanations of the bases for the suspension. Second, plaintiffs allege that they have been deprived of due process because the regulations at issue do not afford them either a pre-suspension or post-suspension hearing. Third and finally, plaintiffs claim that their Fifth Amendment rights have been violated because the suspension could continue indefinitely with no

Secretary contains two elements—presentment and exhaustion. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court recognized that the presentment element was not waivable, but the exhaustion element was waivable so long as plaintiff: (1) raises a colorable constitutional claim collateral to the substantive claim of entitlement; (2) shows irreparable harm would result from exhaustion; and (3) shows futility, i.e., that the purposes of exhaustion would not be served by requiring further administrative procedures. *Id.* 424 U.S. at 330–31.

Plaintiffs insist that this court can review the agency's action to suspend benefits under § 405(g) since they have "presented" their claim to the agency through the rebuttal statements and because the "exhaustion" requirement can be waived in this case. For reasons stated *infra*, this court finds that the exhaustion requirement should not be waived because plaintiffs have not raised a "colorable constitutional claim collateral to the substantive claim of entitlement." *Mathews*, at 330–31.

19. In addition to 28 U.S.C. § 1331, plaintiffs allege that this court has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. However, 28 U.S.C. § 2201 is procedural only and does not provide jurisdiction when it is otherwise lacking. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Moreover, plaintiffs assert that this court has mandamus jurisdiction pursuant to 28 U.S.C. § 1361. Yet, mandamus jurisdiction is only available when plaintiff "has exhausted all other avenues of relief and only if the defendant owes plaintiff a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). Here, for the reasons stated *infra*, plaintiffs have not shown that the Secretary owes them a clear nondiscretionary duty to provide them either a detailed statement of the fraud allegations or provide them a hearing. *Homewood*, 764 F.2d at 1251–52.

effective means to challenge it.[20]

In regard to plaintiffs' claim that they have been deprived of due process because they have not been given a detailed explanation of the bases for the suspension, this court finds that it will most likely fail. Plaintiffs have been furnished with sufficient information, and in particular plaintiffs have been given information from which they can provide a meaningful rebuttal. Indeed, if this court were to require any more particularization than what has already been supplied plaintiffs, it "would infringe upon the Secretary's administrative jurisdiction" and hamper the impending investigation. *Electro–Therapeutics, Inc. v. Bowen,* 1988 WL 9960, at *3, (S.D.N.Y., Feb. 3, 1988).

As for plaintiffs' second due process claim, i.e. that the failure to provide them a pre-suspension or post-suspension hearing violates their procedural due process rights, this court finds it specious as well. Courts have repeatedly rejected such claims. *See Arecibo*

*Medical Hospice Care et al. v. Shalala,* 1994 WL 448678 at *2 (D.Puerto Rico, Aug. 18, 1994); *Clarinda Home Health v. Shalala,* 100 F.3d 526, 531 (8th Cir.1996); *Krebsbach v. Heckler,* 617 F.Supp. 548, 550 (D.Ne.1985); *Electro–Therapeutics, Inc. v. Bowen,* 1988 WL 9960 at *3 (S.D.N.Y., Feb. 3, 1988); *Peterson v. Weinberger,* 508 F.2d 45, 50 (5th Cir.1975), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975).[21]

Finally, in regard to plaintiffs' claim that the Medicare regulations contravene the Fifth Amendment in that they provide for indefinite suspension of payments without a hearing, this court finds that plaintiffs are not likely to succeed. The regulations do *not* provide for the indefinite suspension of payments. To the contrary, the recently revised regulations set definite time limits on the suspension of payments. Suspensions are limited to 180 days with a possible extension of up to 180 days being granted by the HCFA in limited circumstances. In fact, regulations in effect prior to December 2,

---

**20.** A prerequisite to any claim of procedural due process is a finding of a property or liberty right. *Mathews v. Eldridge,* 424 U.S. at 333. Plaintiffs assert that they have a property interest in the funds due and owing them. (Query whether the funds being suspended are in fact due and owing plaintiffs. If the allegations of fraud are confirmed to be true, then the funds would not be due and owing plaintiffs). Plaintiffs also allege that they have a liberty interest in their reputation and continued existence. For purposes of deciding this motion, this court will assume that plaintiffs do have the aforementioned property and liberty interests.

Plaintiffs also seem to be arguing that they have a property interest in the continued participation in the Medicare program. Courts are in disagreement as to whether such a property interest exists. *Compare Cervoni v. Secretary of Health Ed. & Welfare,* 581 F.2d 1010, 1018 (1st Cir.1978) (finding no property interest in a physician's continuing eligibility to bill for a reimbursement), *Koerpel, M.D. v. Heckler,* 797 F.2d 858, 863–65 (10th Cir.1986) (finding no property right for physician in continuing eligibility for Medicare reimbursement) and *Arecibo Medical Hospice Care et al. v. Shalala,* 1994 WL 448678 at *2 (D.Puerto Rico, August 18, 1994) (finding no property interest in continued eligibility to receive Medicare payments) with *Cassim v. Bowen,* 824 F.2d 791, 796 (9th Cir.1987) (assuming that plaintiff had a property right in continued participation in Medicaid program); *Ram v. Heckler,* 792 F.2d 444, 447 (4th Cir.1986) (finding physician's expectation of continued participation in Medicare program to be a property

interest protected by the Due Process Clause) and *Southeast Missouri Professional Standards Review Org.,* 622 F.Supp. 520, 530 (E.D.Mo. 1985) (finding due process property interests in continued participation in the Medicare program and in receipt of reimbursement for services), *aff'd.,* 811 F.2d 401 (8th Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988).

**21.** In support of their argument that they are likely to succeed, plaintiffs cite the cases of *ADL, Inc. v. Perales,* 1988 WL 83390 (S.D.N.Y. Aug.2, 1988) and *Hillside Medical Laboratory v. Perales,* 1988 WL 100195 (S.D.N.Y. Sept.22, 1988), wherein it was held that plaintiffs were likely to succeed on their constitutional challenges to the New York Department of Social Services suspension regulations. This court is not persuaded by these cases. First, *ADL* and *Hillside* deal with entirely different regulations than the regulations at issue herein. Moreover, to the extent the regulations at issue in *ADL* and *Hillside* are similar to the regulations at issue in the instant dispute, this court rejects the finding of the *ADL* and *Hillside* courts that the regulations most likely deprive providers and suppliers of due process. This court finds more persuasive the cases of *Clarinda Home Health,* 100 F.3d 526, *Peterson,* 508 F.2d 45, *Electro–Therapeutics,* 1988 WL 9960, *Arecibo,* 1994 WL 448678 and *Krebsbach,* 617 F.Supp. 548, which hold that the regulations at issue do not transgress the Fifth Amendment to the Constitution of the United States of America.

1996 contained no time limits and provided for no pre-suspension or post-suspension hearing, yet they were upheld. *See Krebsbach,* 617 F.Supp. at 551. Certainly, if prior regulations with no time limits were found constitutional, current regulations with time limits are *a priori* constitutional.

In sum, this court finds that plaintiffs are not likely to succeed on any of their due process claims.

## Fourth Amendment

■ Plaintiffs contend that the Fourth Amendment has been violated in this case because the suspension of their benefits constitutes an unreasonable seizure. This court finds that plaintiffs are not likely to succeed on this claim. This court doubts that a "seizure" has even occurred here, given that the suspension of Medicare payments is a temporary withholding of payments during which time "claims continue to be processed and allowable amounts *are credited to the provider's account.*" *Neurological Associates–H.,* 658 F.Supp. at 471 (emphasis added).[22] Assuming arguendo that the suspension does constitute a "seizure" within the Fourth Amendment, the seizure is seemingly "reasonable." U.S. Const. amend. IV (protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). A suspension is a temporary measure effected only after the agency determines that there is reliable information that fraud exists.[23]

In short, this court finds that plaintiffs are not likely to succeed on their Fourth Amendment claim.

## Ultra Vires

■ Plaintiffs also claim that the suspension regulations are *ultra vires.* This court finds that plaintiffs are likely to fail on this claim. The regulations appear to be within the Secretary's statutory authority, particularly under 42 U.S.C. § 1302(a) which provides the Secretary with authority to publish rules and regulations not inconsistent with the Medicare statute, and 42 U.S.C. § 1395hh which provides the Secretary with authority to prescribe regulations to carry out the administration of insurance programs.

For all the foregoing reasons, this court finds that all plaintiffs' claims are likely to fail.

## Irreparable Harm

The second factor to be considered in determining whether a preliminary injunction should issue is whether plaintiffs will suffer irreparable harm absent the issuance of the requested injunction. Plaintiffs have met their burden of showing irreparable harm. In particular, plaintiffs have shown that if the injunction is not issued and payments are suspended, plaintiffs will be driven out of business.

Samuel I. Ajiri, Ph.D., the president of Midwest and the manager of MDM, avers in an affidavit that if payments are suspended, Midwest and MDM will lose over 85% of their income. Dr. Ajiri further avers that if payments are suspended, numerous employees will leave or have to be laid off.[24] Dr. Ajiri also attests that if the injunction is not issued, plaintiffs will lose patients and will be harmed in their future ability to contact third-party payors and managed care pro-

---

**22.** Query also how there can be a "seizure" in this case when it has not been determined yet whether plaintiffs have a right to receive the payments being withheld. The payments may very well not be the property of plaintiffs if they have been obtained via fraud. *Compare Soldal v. Cook County,* 506 U.S. 56, 61–63, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) ("seizure" occurred when plaintiffs' trailer home was torn from its foundation and towed to another lot).

**23.** Plaintiffs cite *Commissioner of Internal Revenue v. Shapiro,* 424 U.S. 614, 629–30, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976) in their discussion

of their Fourth Amendment claim. Yet, *Shapiro* does not guide this court's Fourth Amendment analysis at all, as *Shapiro* did not involve any Fourth Amendment claim or analysis.

Moreover, for the same reasons this court finds plaintiffs' Fourth Amendment claim likely to fail, this court also finds plaintiffs' conversion, replevin and trespass claims likely to fail.

**24.** According to the affidavit of Dr. Ajiri, the workforce of plaintiffs' companies consists of 95% minorities.

grams. In sum, Dr. Ajiri declares that as a result of the suspension of Medicare payments, the plaintiffs will be forced out of business. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir.1995) ("The impending loss or financial ruin of [plaintiff's] business constitutes irreparable injury.").

Defendants contend that the financial injury attested to by Dr. Ajiri does not constitute irreparable harm. Defendants rely on *Manakee Professional Medical Transfer Service, Inc. v. Shalala*, 71 F.3d 574 (6th Cir. 1995), in which the Sixth Circuit, citing *V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020 (11th Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984), found that financial doom to a health care provider as a result of denial of benefits would not necessarily constitute "irreparable injury" warranting judicial waiver of the exhaustion requirement considering the risk known to the health care provider when it enters the program. *Manakee* is distinguishable from the instant case. First, *Manakee* does not hold that being forced out of business as a result of a suspension of Medicare payments *never* can constitute irreparable harm. Instead, the Sixth Circuit merely held that such financial doom does *not necessarily* constitute "irreparable harm." Moreover, in *Manakee*, the plaintiffs had "not substantiated their allegation of irreparable financial harm with any evidence indicating the proportion of their business which comes from Medicare payments" unlike the plaintiffs in this case which have substantiated the financial harm that they would incur if the suspensions were put into effect by providing proof that over 85% of their business comes from Medicare payments. *Id.* at 581.

### Harm to the Public Interest and Others

The third and fourth factors that the court must consider in deciding whether to issue a preliminary injunction is harm to others and harm to the public interest if the injunction is granted. This court is of the opinion that these factors militate against entry of an injunction. In this case, the Secretary has determined that there is reliable information of fraud relating to plaintiffs' practices.[25] Accordingly, if the injunction is granted, the government and taxpayers will be exposed to a tremendous risk that the monies paid on claims which may be fraudulent will never be recovered. *See Neurological Associates–H.*, 658 F.Supp. 468 (finding that plaintiffs had not shown that benefits of injunctive relief would outweigh the harm posed to defendants and the public).

For all the aforementioned reasons, this court finds that a preliminary injunction should not issue.

### ORDER

IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

IT IS FURTHER ORDERED that the temporary restraining order issued by this court on December 15, 1997 is VACATED.

SO ORDERED.

---

25. In the Declaration of Dennis Handley, an auditor of the Medicare Benefit Integrity Unit of HCSA, Inc., a subsidiary of HCSC, he identifies the "reliable information" in some detail. Furthermore, a warrant was issued for the seizure of Midwest's medical records upon a finding of probable cause of Medicare fraud.